656 S.E.2d 359

The STATE, Respondent,

v.

Earle E. MORRIS, Jr., Appellant.

No. 26418.

Supreme Court of South Carolina.

Heard Oct. 16, 2007.

Decided Jan. 14, 2008.

190

192

Joel W. Collins, Jr., and Christian Stegmaier, both of Collins & Lacy, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Jennifer D. Evans, and Assistant Attorney General Deborah R.J. Shupe, all of Columbia, for Respondent.

Chief Justice TOAL.

This is a direct appeal in a criminal case. A jury convicted Appellant Earle E. Morris, Jr., of one count of engaging in a scheme to commit securities fraud and twenty-one counts of securities fraud. On appeal, Morris questions the trial court's rulings as to his motion to dismiss the indictment, the introduction of several pieces of testimony and evidence, and the law on securities fraud charged to the jury. Finding no error in the trial court's decisions on these issues, we affirm.

### FACTUAL/PROCEDURAL BACKGROUND

This case involves criminal charges arising out of the collapse of Carolina Investors, Inc., an investment company headquartered in Pickens County, South Carolina. Appellant Earle E. Morris, Jr., ("Appellant"), joined Carolina Investors in 1972 as a member of the company's board of directors, and eventually became chairman of the board. Both prior to and during this time period, Appellant maintained an active political life.[1] Upon his retirement from state government in 1999, Appellant entered into an employment relationship with Carolina Investors.

Although the business operations of Carolina Investors changed dramatically from the company's creation until it closed, the company raised capital for its operations in roughly the same manner throughout its existence. Carolina Investors operated much like an uninsured savings and loan association, raising capital through the public sale of debentures and other debt instruments. Carolina Investors initially used the

---

1. Appellant served in the South Carolina House of Representatives from 1951–1955, in the South Carolina Senate from 1955–1970, as the Lieutenant Governor of South Carolina from 1971–1975, and as Comptroller General from 1976–1999.

funds generated from these sales to finance individual sales of cemetery plots. The company's services eventually expanded to include a variety of other lending, primarily in the sub-prime market.

Since the company's creation, a hallmark of Carolina Investors was a feature known as "the fifteen minute rule." This rule operated to allow investors to redeem their debentures at any time prior to maturity, but provided for a reduced rate of interest upon such redemption. According to the company, an investor could redeem a debenture at any time and have their money "in fifteen minutes."

In 1991, Carolina Investors became a wholly owned subsidiary of National Railway Utilization Corporation, which eventually became the company HomeGold, Inc. Roughly four years later, Carolina Investors ceased its external lending activities. Although the company continued to raise funds by selling debentures, Carolina Investors simply transferred these funds directly to HomeGold or its other subsidiaries. HomeGold and its subsidiaries primarily used these funds to expand their business operations and pay operating expenses. Although the companies were profitable at one time, Home-Gold began to experience substantial operating losses in 1998. These losses continued to mount, and when HomeGold failed to transfer funds sufficient to cover investors' requests to withdraw the balance of their debentures from Carolina Investors, the businesses closed.

The criminal charges that form the basis of the instant case arose primarily out of Appellant's conduct in the year immediately preceding the collapse of Carolina Investors and Home-Gold. Specifically, the State alleged that in the waning time period of Carolina Investors' operation, Appellant had a great deal of information regarding the dire financial condition of HomeGold and the growing probability that HomeGold would never be able to repay its debt to Carolina Investors. Rumors of the companies' continued viability began to surface with increasing regularity, and the State alleged that as individual customers contacted Carolina Investors with concerns, either in person or over the phone, Carolina Investors employees systematically referred these investors to Appellant, who then misled the investors with false assurances of current and

future profitability. The State also alleged that in some circumstances, customers were able to redeem debentures without having first spoken with Appellant, and that Appellant would thereafter personally contact these individuals and attempt to persuade them to re-invest with Carolina Investors. According to the State, Appellant's misrepresentations caused investors to leave funds on deposit that they would otherwise have withdrawn and persuaded investors to deposit additional funds or re-invest withdrawn funds with the company. The State alleged that Appellant's actions were in furtherance of a scheme to keep a steady stream of money flowing to Home-Gold.

At trial, Appellant asserted that his projections to investors were not intentional misrepresentations, but were instead genuinely held sentiments based upon projections received from executives at HomeGold or their professional consultants. Appellant further argued that his position as chairman of Carolina Investors' board of directors was merely an illusory position, and that he was kept in the dark as to the company's bleak financial situation. The jury ultimately convicted Appellant of one count of engaging in a scheme to commit securities fraud and twenty-one individual counts of securities fraud. The trial court sentenced Appellant to forty-four months imprisonment, and this appeal followed.

This Court certified the case from the court of appeals pursuant to Rule 204(b), SCACR, and Appellant presents multiple issues for this Court's review:

I. Should Appellant have been granted immunity as a result of his pre-trial statement to representatives of the South Carolina securities commissioner?

II. Did the trial court err in charging the jury that criminal securities fraud could include conduct exhibiting "extreme recklessness," "severe recklessness," and "extreme indifference?"

III. Did the trial court err in allowing certain testimony from the State's corporations and securities law expert?

IV. Did the trial court err in disallowing testimony from Appellant's legal ethics expert?

V. Did the trial court err in excluding the report prepared by the bankruptcy court's examiner?

VI. Did the trial court err in denying Appellant's motion to dismiss the indictment?

VII. Did the trial court err in denying Appellant's request for a continuance?

## LAW/ANALYSIS

### I. Immunity from Prosecution

■ Appellant argues that the trial court should have granted him immunity as a result of his pre-trial statement to representatives of the South Carolina securities commissioner. We disagree.

In *State v. Thrift*, we held that the South Carolina Constitution requires that a person compelled to provide the government with self-incriminating testimony be granted immunity from any prosecution for a transaction or offense to which the person's testimony relates. 312 S.C. 282, 301, 440 S.E.2d 341, 351 (1994) (interpreting S.C. Const. art. I, § 12 to require transactional immunity for compelled testimony). In *Thrift*, we addressed the question of immunity in the context of compelled testimony before the State Grand Jury. *Id.* at 296, 440 S.E.2d at 349. Although this Court affirmed the trial court's decision dismissing the indictments against several defendants on a number of alternative grounds, we nevertheless held that the then-applicable immunity statute providing simply for use immunity failed to comport with the Constitution's demands. *Id.* at 301, 440 S.E.2d at 351.

Appellant asserts *Thrift* requires that he be granted immunity from prosecution in this case. Specifically, Appellant argues that the Attorney General used his statutory authority as securities commissioner to compel Appellant to offer self-incriminating testimony.[2] Though intriguing at first blush, this argument is not supported by the facts of the instant case.

---

**2.** S.C.Code Ann. § 35-1-20(1) (Supp.2004) provides that the Attorney General of South Carolina serves as the ex officio securities commissioner.

In 2005, the Legislature comprehensively amended South Carolina's securities laws. *See* Act No. 110, 2005 S.C. Acts 681 ("the South

*Thrift's* compulsion requirement supplies the first hurdle that Appellant's argument cannot negotiate. More specifically, Appellant was not compelled to appear before the securities commissioner, nor was Appellant compelled to answer any questions before the commissioner's representatives. The record instead reflects that very shortly after the collapse of Carolina Investors and HomeGold, the securities commissioner issued a subpoena *duces tecum* requesting that Carolina Investors, the president of the company, and the chairman of the board supply documents and records relating to the business. We find it instructive that this subpoena was not directed to any individuals, nor did it request any personal appearances.

Although Appellant argued in testimony to the trial court that he was "compelled" to attend the meeting with the representatives of the securities commissioner, Appellant later testified that he advised a member of the securities commissioner's staff that he desired to personally meet and discuss the situation, as he and other representatives of the company had often done in the past. Appellant no doubt felt a strong desire to appear before the securities commissioner to provide information and be of assistance, but we think that a strong desire to provide assistance cannot be the equivalent of compulsion. *See Thrift,* 312 S.C. at 297, 440 S.E.2d at 349 (speaking of compelled testimony as testimony wrung from a person by force). Because there is no evidence that the securities commissioner compelled Appellant's testimony, Appellant's argument based on *Thrift* is inapposite.

To achieve his desired result through an alternate route, Appellant makes the novel argument that in order to avoid *Thrift's* rule regarding immunity, the securities commissioner was required to inform Appellant of his constitutional right against self-incrimination and obtain a valid waiver of that right prior to questioning Appellant. Again, we disagree.

Carolina Uniform Securities Act of 2005"). In doing so, the Legislature reorganized a great deal of the statutes at issue here. Though the definitional statute now appears in a different code section, *see* S.C.Code Ann. § 35–1–102(28) (Supp.2006), this reorganization does not appear to have substantially altered the relevant statutory language.

■ Appellant's argument here presumes too much. Essentially, Appellant argues that the securities commissioner may not place a person under oath without advising the person of his constitutional rights, and that the failure to do so should require a de facto finding of compulsion. Though the most prudent practice in any investigative scenario would always be for law enforcement to advise any person from whom information is sought of the individual's constitutional rights, the Constitution does not require such prudence. The law instead requires only that the government apprise a person of the constitutional privilege against self-incrimination when the person is subjected to interrogation while in the custody of law enforcement. *See e.g. State v. Evans,* 354 S.C. 579, 583, 582 S.E.2d 407, 409–410 (2003) (citing *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). Accordingly, we focus our inquiry, as did the trial court, on whether Appellant was in custody when he gave his statement to the securities commissioner's representatives.

■ In our view, Appellant was not in custody when he gave his statement to representatives of the securities commissioner. The evidence illustrates that Appellant was not ordered to appear at the meeting, there is no evidence that Appellant was a suspect of any crime at this point, and there is no evidence that Appellant was prohibited from leaving at any point. Although the evidence illustrates that the interview occurred at the securities division in the Attorney General's office, there is no evidence as to who requested that the meeting occur there, nor is there evidence that the purpose of this meeting was to elicit incriminating statements from Appellant. Because Appellant cannot point to any factors demonstrating that he gave his statement while in the government's custody, the securities commissioner was under no obligation to advise Appellant of his constitutional rights.

■ As a final immunity-based argument, Appellant argues that the State impermissibly pursued criminal charges against him under the guise of the securities commissioner's administrative investigation into the collapse of Carolina Investors. We disagree.

Appellant draws on both this Court's precedent and federal precedent in support of his argument. In *State v. Quattleb-*

*aum*, 338 S.C. 441, 527 S.E.2d 105 (2000), the trial court refused to disqualify a circuit solicitor's office from prosecuting a defendant where several sheriff's officers and a deputy solicitor monitored and recorded a privileged communication between the defendant and his attorney. This Court reversed, and in doing so, the Court held that deliberate prosecutorial misconduct raises an irrebuttable presumption of prejudice. *Id.* at 449, 527 S.E.2d at 109. The Court noted that "[t]he participation at trial of a prosecutor who has eavesdropped on the accused and his attorney tarnishes us all." *Id.*

Similarly, in *United States v. Kordel*, 397 U.S. 1, 12–13, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970), the United States Supreme Court rejected the argument that a government's inquiry directed against a corporate defendant ought to per se immunize a corporation's directors from subsequent criminal prosecution. Speaking where the issue was parallel investigations of a food company by the Food and Drug Administration and the United States Attorney's office, the court noted that while it is clear that the government may not "use evidence against a defendant in a criminal case which has been coerced from him," the occurrence of parallel civil and criminal investigations does not, absent extraordinary circumstance, violate a defendant's rights to due process. *Id.*

We hold that both *Quattlebaum* and *Kordel* are totally inapplicable to the instant case. There has been absolutely no showing of any prosecutorial misconduct in this matter, and Appellant has not demonstrated that his prosecution is unconstitutional, improper, or that the government pursued a civil action or investigation solely to obtain evidence for a criminal prosecution. Although it is likely that information conveyed in the statement to the securities commissioner's representatives ultimately assisted in the State's criminal investigation, there is no evidence that the State contemplated a criminal investigation of Appellant at the time of the meeting.[3] It is not impossible for us to envision circumstances that might raise concerns when combined with the fact that the South Carolina official vested with the power to institute civil investigations in

---

3. The meeting occurred roughly two weeks after Carolina Investors closed, and the State Grand Jury indicted Appellant approximately nine months later.

securities matters also serves as the State's chief criminal prosecuting officer. But in this case, there is simply no support for any analogy or purported similarity between the instant case and *Quattlebaum* or *Kordel.*

For these reasons, we hold that the trial court did not err in determining that Appellant is not entitled to immunity from prosecution.

## II. Jury Charges

■ Appellant argues that the trial court erred in charging the jury that criminal securities fraud can include conduct exhibiting "extreme recklessness," "severe recklessness," and "extreme indifference." More specifically, Appellant argues that a conviction for criminal securities fraud requires a finding of scienter, and that the trial court's charges did not instruct the jury accordingly. We disagree.

As a primary matter, Appellant is mistaken in his characterization of the trial court's charges. In addition to charging the jury that it could find that Appellant violated the securities laws if it found that Appellant knowingly committed misconduct, the court charged the jury that it could convict Appellant if it found that he engaged in conduct "which presents a danger of misleading buyers or sellers that is either known to [Appellant] or is so obvious that [Appellant] must have been aware of it."[1] Stated differently, the court charged that in order to support a conviction, the jury needed to find that Appellant intentionally misled investors, or that Appellant knew that there was a danger that his conduct would mislead investors.

■ The trial court's charges accurately characterized the mental state required for a criminal conviction for securities fraud in South Carolina. Where a statute does not specify that criminal liability is to be imposed based upon graduated levels of intent, we are extremely reluctant to draw such distinctions. Furthermore, we believe that predicating criminal liability on a stricter standard than this would unnecessarily frustrate the purpose of the securities fraud statutes. In S.C.Code Ann. §§ 35–1–1210 and 35–1–1590 (Supp.2004), the

---

4. This latter portion of the charge represents the trial court's definition of the term recklessness.

Legislature saw fit to criminalize the making of untrue or misleading statements in connection with the offer, sale, or purchase of securities, and we can discern no reasonable basis for weakening this prohibition by not imposing criminal liability in the situation where a person makes statements that he or she knows presents a danger of misleading individual investors. Prevention of this type of conduct strikes at the heart of the intended purpose of the securities laws.[5]

A review of the evidence presented at trial is instructive. The record reflects that HomeGold lost over $300 million from 1998 until the companies closed. During this same time, the record reflects that HomeGold's inter-company debt to Carolina Investors grew from about $304,000 to over $275 million. At trial, the State introduced evidence that Appellant attended board meetings where officers discussed HomeGold's enormous losses and the tremendously increasing inter-company debt. The State introduced evidence that Appellant attended meetings where auditors hired by the company discussed the grave circumstances caused by the lack of positive cash flow to HomeGold and the accompanying likelihood that HomeGold would never repay its debt to Carolina Investors. The State introduced evidence that Appellant discussed these circumstances with his fellow board members, and that Appellant attended meetings where the parties explored the issues of bankruptcy or a conservatorship. Finally, the State introduced evidence that despite being fully aware of the dire situation of the company, Appellant used his reputation to aggressively attract and retain customers for Carolina Investors, and that Appellant was financially rewarded based upon his effectiveness in preventing massive requests to redeem debentures.

Witness at trial testified that when confronted with specific questions regarding individual investments and the financial

5. In fact, the statutory scheme expressly forecloses Appellant's argument. *See* S.C.Code Ann. § 35–1–501 cmt. 6 (Supp.2006) (providing that the culpability required to be pled and proven is addressed in the enforcement statute); *see also* S.C.Code Ann. § 35–1–508 cmts. 2, 6 (Supp.2006) (providing that both the current and former versions of the Code impose criminal liability for securities fraud when a person acts intentionally in the sense that the person is aware of what he or she is doing and that "[p]roof of evil motive or intent to violate the law or knowledge that the law was violated is not required").

situation of the company, Appellant responded "I see the numbers and your money is safe," that there was no way that anyone was going to lose any money, and that there was a lawsuit against another company for putting out false information about Carolina Investors. Additional witnesses testified that Appellant told customers that Carolina Investors had been "sold to a company in California," that Carolina Investors was "as solid as the floor we're standing on," that the company was "as solid as the rock of Gibraltar," and that "money here is as good as if it were gold." This case was not, as Appellant suggests, an example of looking backwards at his conduct through the often distorting lens of hindsight. Instead, the theory of the State's case revolved around evidence showing what Appellant said to twenty-one specific investors versus what Appellant knew to be the financial reality. If the inclusion of the term recklessness, despite the trial court's detailed definition of the term, could have introduced any ambiguity into the jury's understanding of the law, it had no effect on this case. The instant case did not deal with reckless conduct.

Accordingly, we hold that the trial court did not err in charging the jury as to the mental state required for a criminal conviction of securities fraud.

### III. The State's Expert

At trial, the State offered Gregory B. Adams as an expert in corporate and securities laws. Appellant argues that Adams was not qualified to opine on issues of corporate and securities laws in South Carolina because Adams is not licensed to practice law in South Carolina. We disagree.

The qualification of a witness as an expert is a matter largely within the trial court's discretion and will not be reversed absent an abuse of that discretion. *State v. Myers*, 301 S.C. 251, 255, 391 S.E.2d 551, 554 (1990). Generally, defects in the amount and quality of an expert's education or experience go to the weight to be accorded the expert's testimony and not to its admissibility. *Id.* In South Carolina, expert testimony is admissible where the testimony will assist the trier of fact in understanding the evidence or determining a fact in issue. Rule 702, SCRE.

Despite Appellant's argument to the contrary, the status of Adams' law license is completely irrelevant to his qualification as an expert. The evidentiary rule governing the qualifications of experts says nothing about professional licensing requirements, and a licensing requirement seems wholly incompatible with Rule 702's operational framework. At the time of trial, Adams had been a law professor at the University of South Carolina for more than twenty-five years, with experience teaching corporate and securities law classes. Furthermore, the record reflects that Adams served as one of the authors of the 1988 South Carolina Business Corporations Act, and that Adams serves as one of the co-authors of the primary practice manual on corporate law used in this state. In light of this evidence, the trial court clearly did not abuse its discretion in qualifying Adams as an expert on corporate and securities laws.[6]

Appellant next contends that Adams' testimony was contrary to the law of South Carolina and should have been excluded. We disagree.

Adams testified that in certain contexts, statements that are often associated with unactionable puffery can constitute fraudulent misstatements in violation of the securities laws. Although Appellant may be correct that, in general, "projections of future performance not worded as guarantees are not actionable under securities laws," Adams did not testify to the contrary. Instead, Adams testified that commercial puffery, by definition, excludes statements that are material to investors, and that the atmosphere in which a statement is made bears on its materiality. Because Appellant does not accurately describe Adams' testimony, Appellant's argument is unpersuasive.

---

6. Appellant relies in part on S.C.Code Ann. § 40–22–20(22) (Supp. 2006) to support his policy-based argument that an expert on South Carolina law should be required to be licensed to practice law in this state. Although Appellant correctly points out that § 40–22–20(22) defines the practice of engineering to include offering expert testimony, Appellant overlooks this Court's decision in *Baggerly v. CSX Transp., Inc.*, 370 S.C. 362, 374–75, 635 S.E.2d 97, 103–04 (2006), where this Court declined to interpret the practice of engineering statute to preclude the offering of expert testimony by a person not licensed as a professional engineer in South Carolina.

As a final point on this issue, Appellant argues that the trial court improperly allowed Adams to opine on the ultimate issue in this case, which is whether Appellant engaged in fraudulent conduct. Again, we disagree.

This Court's rules provide that "[t]estimony in the form of an opinion ... otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Rule 704, SCRE. In this case, the State concluded its examination of Adams by presenting a series of hypothetical situations and asking whether certain actions in those hypotheticals would be illegal. Although this testimony arguably involved the ultimate issue in the instant case, this case required the jury to analyze facts and circumstances as they existed in a complex business environment, and the trial court determined that expert testimony would assist the jury in making its determinations. For this reason, this case differs substantially from the expert testimony cases upon which Appellant relies.[7]

For the foregoing reasons, we affirm the trial court's decision regarding the qualification of the State's corporate and securities law expert and the admission of the expert's testimony.

### IV. Exclusion of Appellant's Ethics Expert

Appellant argues that the trial court improperly excluded the testimony of his expert in legal ethics and conflicts of interest. We disagree.

The admission or exclusion of evidence is left to the sound discretion of the trial court, and the court's decision will not be reversed absent an abuse of discretion. *State v.*

---

7. In *Dawkins v. Fields*, 354 S.C. 58, 580 S.E.2d 433 (2003), this Court held that the trial court properly refused to consider an expert affidavit filed in response to a summary judgment motion where the affidavit largely contained only legal opinions, conclusions, and no factual support. Similarly, in *O'Quinn v. Beach Assocs.*, 272 S.C. 95, 249 S.E.2d 734 (1978), the trial court refused to permit an expert to opine on whether an offer of commercial services would constitute the offering of investment contracts under federal law. Affirming the trial court's decision, this Court held that the testimony was offered to establish a conclusion of law within the exclusive province of the court, and thus was properly excluded. *Id.* at 107, 249 S.E.2d at 740.

*Gaster*, 349 S.C. 545, 557, 564 S.E.2d 87, 93 (2002). An abuse of discretion occurs when the trial court's decision is based upon an error of law or upon factual findings that are without evidentiary support. *State v. Irick*, 344 S.C. 460, 464, 545 S.E.2d 282, 284 (2001).

At trial, Appellant offered attorney Desa Ballard as an expert in legal ethics and conflicts of interest. Through Ballard, Appellant sought to offer testimony as to the conflict of interest HomeGold's officers and corporate attorneys experienced by simultaneously representing Carolina Investors in various capacities.[8] Although the trial court qualified Ballard as an expert, the court held that her testimony as to conflicts of interest was irrelevant, and alternatively, that the testimony would confuse the issues in the case.

The trial court did not abuse its discretion in excluding Ballard's testimony. This Court is concerned by the apparent conflict of interest created by the fact that a single law firm attempted to provide legal services to two companies whose relationship, given the financial characteristics of the situation, was anything but symbiotic; and additionally by the fact that a principal of the law firm served as an officer on the board of the parent corporation. But assuming, without deciding, that a conflict existed here, Appellant cannot demonstrate how any attorney's action or inaction caused him to believe that it was advisable to mislead investors. Similarly, Appellant points to no evidence indicating that any attorney was knowledgeable of his conduct, particularly as to Appellant's statements to individual investors. Accordingly, the trial court did not abuse its discretion in concluding that issue of a law firm's conflict of interest was irrelevant and confusing with respect to the issues presented in this case.

For these reasons, we hold that the trial court did not err in excluding the testimony of Appellant's expert in legal ethics and conflicts of interest.

---

8. The law firm Wyche, Burgess, Freeman, and Parham served as HomeGold's corporate counsel and also prepared Carolina Investors' annual prospectus for approval by the securities commissioner. Attorney C. Thomas Wyche served as an officer on HomeGold's board of directors.

## V. Exclusion of the Bankruptcy Examiner's Report

 Appellant argues that the trial court incorrectly excluded the report prepared by the bankruptcy examiner in the federal bankruptcy litigation involving Carolina Investors and HomeGold from evidence. Specifically, Appellant argues that the bankruptcy examiner's report was admissible under the public records and reports exception to this Court's general rule excluding hearsay evidence. *See* Rules 802 & 803(8), SCRE. We disagree.

Appellant's argument regarding the public records or reports exception to the hearsay rule is, in our view, misguided. Rule 803(8), SCRE, specifically provides that "investigative notes involving opinions, judgments, or conclusions are not admissible." An examination of the bankruptcy examiner's report reveals that the report contains a great deal of investigative opinions, legal analysis, and potential conclusions.[9] For these reasons, we hold that the trial court correctly concluded that the bankruptcy examiner's report was outside the scope of the public records and reports exception.

 Appellant makes a second argument that the "rule of completeness," *see* Rule 106, SCRE, required the trial court to admit the examiner's report into evidence, but we believe this argument is similarly flawed. As the trial court made clear, it did not admit the examiner's report or any part of the examiner's report into evidence. Furthermore, the State did not offer any testimony, expert or otherwise, that drew from the examiner's report or any part thereof. Because the trial court never admitted any portion of the examiner's report, Appellant's rule of completeness argument is inapposite.

Accordingly, we hold that the trial court did not err in excluding the bankruptcy examiner's report.

---

9. By way of example, the report provides that "[m]anagement and its advisors knew that their investor customers would equate [Carolina Investors] with a bank," and "it is clear that the game plan was to knowingly gamble the money of unsophisticated creditors." The report also offers numerous conclusions beginning with the preface "there is sufficient evidence for a finder of fact to conclude." Additionally, the examiner opines on the applicability of several potential legal defenses, and opines specifically that the business judgment rule would not protect the officers and directors of Carolina Investors.

## VI. Dismissal of the Indictment as Defective

[17] Appellant argues that the trial court incorrectly denied his motion to dismiss the indictment as defective. Specifically, Appellant argues that the conduct set forth in the indictment does not fall within the purview of the criminal statutes the State charged him with violating because all alleged misstatements regarding Carolina Investors' financial health and business operations were to pre-existing customers and not prospective customers. We disagree.

Appellant takes far too narrow a view of the statute's application. Specifically, Appellant's argument overlooks S.C.Code Ann. §§ 35-1-20(13)(a) and (b) (Supp.2004), providing that "sale" means every contract for the sale of, contract to sell, or contract for the disposition of a security or interest in a security for value; and that an "offer" includes every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value. Because Carolina Investors customers had the option of disposing of their debentures prior to maturity, there is no reasonable way to view Appellant's conversations with customers as not relating to offers to dispose of securities. In fact, the only arguable purpose of Appellant's statements to customers was to prevent the disposition of securities.

For the foregoing reasons, we hold that the trial court did not err in denying Appellant's motion to dismiss the indictment as defective.

## VII. Appellant's Request for a Continuance

■ Appellant argues that the trial court incorrectly denied his request for a continuance. We disagree.

■ The trial court's denial of a motion for a continuance will not be disturbed on appeal absent a clear abuse of discretion. *State v. McMillian*, 349 S.C. 17, 21, 561 S.E.2d 602, 604 (2002). In support of his argument that the trial court abused its discretion in denying his request, Appellant argues that his trial was premature and that had the court granted a continuance, Appellant would have been able to demonstrate that he was a victim of an intentional campaign of deception by HomeGold executives. Appellant asserts that he did not call several potential witnesses who would have corrob-

orated his theory of the case because these witnesses had criminal trials pending and would have asserted their Fifth Amendment rights.

Appellant cannot demonstrate that he suffered any prejudice as a result of being forced to proceed to trial rather than being granted a continuance.[10] At trial, Appellant presented a great deal of evidence, including his personal testimony, regarding what he alleged to be evidence of HomeGold's scheme to hide financial data from Carolina Investors officials. Furthermore, Appellant presented the testimony of several coworkers to corroborate his "kept in the dark" defense. Importantly, Appellant cannot demonstrate that the grant of a continuance would have in any way affected the Fifth Amendment considerations he raises in support of his argument. In our view, the grant of a continuance would have generated no such effect.

As a housekeeping matter on this issue, it is instructive to note that this Court's evidentiary rules speak to the subject of continuances in the context of unavailable witnesses. Rule 7(b), SCRCrimP, provides:

No motion for continuance of trial shall be granted on account of the absence of a witness without the oath of the party, his counsel, or agent to the following effect: the testimony of the witness is material to the support of the action or defense of the party moving; the motion is not intended for delay, but is made solely because he cannot go safely to trial without such testimony; and has made use of due diligence to procure the testimony of the witness or of such other circumstances as will satisfy the court that his motion is not intended for delay.

At trial, Appellant did not demonstrate any of the above-described hardships in support of his request for a continuance. Furthermore, in light of the evidence introduced at trial, any testimony from unavailable witnesses or other unavailable evidence would likely have been cumulative. Accordingly, there is no indication that Appellant would have been able to make a successful argument for a continuance based upon Rule 7(b).

10. The State Grand Jury indicted Appellant in January 2004, and Appellant's trial occurred during November 2004.

Accordingly, we hold that the trial court did not abuse its discretion in denying Appellant's request for a continuance.

## CONCLUSION

For the foregoing reasons, we affirm Appellant's conviction and sentence.[11]

MOORE, WALLER and BEATTY, JJ., concur.

PLEICONES, J., concurring in a separate opinion.

Justice PLEICONES.

I concur in the majority's decision to affirm appellant's convictions and sentences, but write separately because I view several of the issues differently than does the majority. I have addressed the issues in the same order.

I agree that appellant was not entitled to immunity because he was not compelled to provide the State with self-incriminating information. *State v. Thrift*, 312 S.C. 282, 440 S.E.2d 341 (1994). I do not join that part of the majority opinion which advises investigators to impart *Miranda* warnings where they are not otherwise required

I agree that the jury instruction given in this case did not misstate the scienter requirement in a securities fraud prosecution. *See State v. Thompkins*, 263 S.C. 472, 211 S.E.2d 549 (1975)(knowingly means actual knowledge, but one can not avoid "knowing" by shutting one's eyes to what would otherwise be obvious). Unlike the majority, I would not find that a review of the evidence is in order. As I view appellant's complaint, it is not that the charge was not warranted by the evidence, but rather that it misstated the scienter requirement. Finally, I would not engage in the harmless error

---

11. As an eighth issue on appeal, Appellant argues that the trial court erred in denying his motion for a directed verdict. We affirm the trial court's decision on this issue pursuant to Rule 220(b)(1), SCACR, and the following authority: *State v. Weston*, 367 S.C. 279, 292–93, 625 S.E.2d 641, 648 (2006) (providing that a trial court examines a request for a directed verdict based on the existence or nonexistence of evidence, and that if there is any direct or substantial circumstantial evidence reasonably tending to prove the defendant's guilt, the case must be submitted to the jury).

analysis undertaken at the conclusion of section II of the opinion, as I would find no error in the charge given.[12]

As to the testimony of the State's expert, I agree with the majority that we should affirm the trial court's ruling that the expert was qualified. *See Smith v. Haynsworth*, 322 S.C. 433, 472 S.E.2d 612 (1996).

As to appellant's contention that the trial court erred in not permitting his expert to testify to a law firm's alleged conflict of interest, I would affirm as the proffered testimony was simply not relevant. Rule 402, SCRE.

I agree that the Bankruptcy Examiner's Report was properly excluded from evidence.

I agree that the trial judge did not err in refusing to dismiss the indictment, which is couched in the language of the statute. *E.g., State v. Means*, 367 S.C. 374, 626 S.E.2d 348 (2006) *qualified on other grounds Talley v. State*, 371 S.C. 535, 640 S.E.2d 878 (2007). In my view, appellant's contention that the evidence did not show a statutory violation is one to be addressed at trial at the directed verdict stage, not a defect apparent on the face of the indictment warranting the indictment's dismissal.

Finally, I agree with the majority's decision to affirm the denial of appellant's continuance request, and to affirm the denial of his directed verdict motion.[13]

For the reasons given above, I concur in the majority's decision affirming appellant's convictions and sentences.

---

12. This is not to suggest that I would endorse the instruction as a model charge.

13. I note that the directed verdict is contested not on the basis that the State failed to prove in some counts that there was a "sale" of securities as defined by the statute, but on the ground that the State failed to prove appellant possessed the requisite intent.