723 S.E.2d 176

The STATE, Respondent,

v.

John M. STERLING, Jr., Appellant.

No. 27096.

Supreme Court of South Carolina.

Heard Oct. 4, 2011.

Decided Feb. 29, 2012.

Rehearing Denied April 5, 2012.

William W. Wilkins, Kirsten E. Small and Andrew Mathias, all of Nexsen Pruet, of Greenville, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh and Assistant Attorney General William M. Blitch, Jr., all of Columbia, for Respondent.

Justice PLEICONES.

Appellant was charged with three criminal offenses: securities fraud in violation of S.C.Code Ann. § 35–1–501(3) (Supp. 2010);[1] making false or misleading statements to the State Securities Commission in violation of S.C.Code Ann. § 35–1–505 (Supp.2010); and criminal conspiracy in violation of S.C.Code Ann. § 16–17–410 (2003). He was convicted of securities fraud, acquitted of making a false or misleading statement and conspiracy, and received a five-year sentence. He now appeals, alleging the trial judge abused his discretion in permitting testimony from investors, that he erred in denying appellant's directed verdict motion, and that he committed reversible error in charging the jury. We affirm.

## FACTS

Appellant and several other businessmen invested in a company in the 1970s that leased railroad box cars. That company eventually declared bankruptcy, but emerged with one asset: a deferred tax asset (DTA). This DTA, which could be carried forward on a company's books to offset future profits, fluctuated in value depending on whether the company anticipated making a profit. This post-bankruptcy company was known as NRUC. In 1991, NRUC acquired a Pickens-based company, Carolina Investors, Inc. (CI).

CI had been founded in 1963, originally for the purpose of making loans to individuals purchasing cemetery plots. CI, which was funded by notes and subordinated debentures sold exclusively to South Carolina investors, eventually began making small household loans and, by 1970, was involved in non-conforming subprime mortgages. Non-conforming and subprime mortgages are made to persons who cannot qualify for regular (conforming) mortgages: non-conforming mortgages

---

1. Appellant was actually indicted under the predecessor statute, S.C.Code Ann. § 35–1–1210(3) (1987), which was repealed and replaced by § 35–1–501(3) effective January 1, 2006.

carry a higher interest rate reflecting the greater risk of default.

CI had a policy of allowing investors to redeem their debentures at any time prior to maturity upon fifteen minutes' notice, albeit at a reduced interest rate. CI's investments were not federally insured, but because it made loans to persons who could not meet the credit standards required by conforming mortgage lenders, it paid higher than average interest rates on the notes and debentures.

NRUC was subsequently renamed Emergent and later HomeGold Financial (HGFin).[2] HGFin, the parent company, acquired a number of other financial subsidiaries, one of which, HomeGold, Inc. (HGInc), became a subprime lender. Thereafter, while CI continued to raise monies through the sale of notes and debentures, those funds were loaned to HGFin and its other subsidiaries, and used primarily to expand business operations and pay business expenses of those entities.

During the period 1995–97, the HGFin companies were very profitable. In 1996, HGFin went public, divesting itself of several subsidiaries and becoming a pure financial services entity. In late 1997, HGInc, the subprime lender subsidiary, lost its leader, who took much of his team with him. That loss, coupled with a worldwide credit crisis in 1998, caused HGInc to suffer enormous losses. In an effort to recover economic viability, HGFin sold most of its other financial service subsidiaries, keeping only HGInc and CI. From 1998 until HGFin declared bankruptcy in 2003, HGFin and HGInc [3] never had an operating profit.

The retail mortgage lending business relies on "warehouse lines" from large lenders in order to operate. Essentially, the warehouse lines provide the working capital for the lending business, and the stability of those lines, which is dependent upon the large bank's confidence in the lender, is critical to the mortgage lender's business.

---

**2.** We will refer to the parent company as HGFin for the remainder of the opinion.

**3.** HGInc was sold to EMMCO before HGFin and CI's 2003 bankruptcies.

In its efforts to keep HGInc operational, with the hope it could repay to CI all the monies loaned by CI to HGInc (the intercompany debt), HGFin shrank both the number of subsidiaries and the operational aspects of HGInc. Eventually, HGFin began to look for a merger partner for HGInc in order to save the business. After several merger prospects fell through, HGFin settled upon a Lexington, South Carolina, subprime lender called HomeSense, which was owned by Ronald Sheppard. Appellant, who at the time of the 2000 merger between HomeSense and HGInc was CEO of both HGFin and HGInc, chairman of the board of both HGFin and HGInc, and on CI's board, was the leading proponent of the HomeSense merger.

The HomeSense–HGInc merger was not a success. First, due diligence completed after the merger demonstrated that HomeSense had significantly overstated its net worth. HGInc and Sheppard subsequently canceled a mutual indemnity agreement in exchange for Sheppard's remaining a guarantor on certain HomeSense debts. Second, Sheppard proved to be an abrasive leader whose leadership style and aggressive accounting maneuvers caused a number of HGInc and HGFin officers and executives to leave. Sheppard also placed personal expenses on the company books using HGInc to subsidize his extravagant lifestyle.

After the merger, appellant ceased to be an employee, but remained as chair of both the HGFin and HGInc boards, and remained on CI's board. He continued to be supplied with an office, an administrative assistant, and a salary. Over the next three years, the financial decisions made on behalf of HGInc resulted in numerous resignations by CFOs and others. In addition, the HGInc–HomeSense merger permitted HGInc's largest warehouse lender (CIT) to end the relationship.[4] As a result of the loss of CIT's warehouse line, HGFin and HGInc's continued financial woes, and their reliance on CI investor money to stay in business, it became increasingly difficult for HGInc to obtain sufficient warehouse lines to fund its loans even as it began to increase its share of the subprime mortgage market. HGFin and HGInc continued to struggle

---

4. The contract between HGInc and CIT allowed the lender to end the relationship upon a change in HGInc's corporate structure.

and began moving debts and assets among the companies in order to hide its financial difficulties.

Appellant's defense was predicated in large part on the fact that the financial maneuvers that took place were approved by outside auditors, and that the Wyche Law Firm vetted and approved all of the companies' governmental filings and prospectuses. As stated above, the jury acquitted appellant of making false or misleading statements to the State Securities Division. Reliance upon the outside auditors' approval, however, is misleading. For example, the outside auditors agreed to an increase in the value of the DTA from $12 million to $22 million, as urged by appellant, in HGInc's unaudited third quarter 2000 10–Q. The auditor testified, however, that had he been told that this change in valuation was being made because HGInc needed to show a positive net equity in that quarter in order for it to renew its state mortgage licenses, that information would have "raised a red flag" and alerted him to the precarious nature of HGFin's finances.

Similarly, while the auditor was aware that CIT, HGInc's largest warehouse lender, was withdrawing its line of credit following the HomeSense merger, the auditor was never told that this secured lender had told appellant and others that it was ending the relationship because it "didn't want to be standing in front of a little old lady in Pickens County during a bankruptcy proceeding." Again, this information would have raised a red flag for the auditors, indicating that a secured creditor was fearful of HGInc's financial worth. Moreover, there was evidence that the auditors were not informed of certain regulatory inquiries, in violation of their management letter.

Over time, the only thing keeping HGInc in the retail mortgage business was the influx of cash from CI investors. In 1999, the intercompany debt, owed by HGInc to CI, was about $67 million; in 2000, $100 million; by the end of 2001, $144 million; and at year end 2002, more than $243 million.

By 2001, the outside auditors expressed grave concerns over HGInc's ability to repay the intercompany debt to CI and its ability to remain a going concern, and they criticized a number of its accounting decisions. HGFin and HGInc continued to rely on overly optimistic projections to suggest that the com-

panies could recover viability. In October 2001, the auditors required HGFin to obtain an independent valuation of HGInc to determine whether the intercompany debt between HGInc and CI should be reported as "impaired." An impairment is an opinion by the auditors that the borrower cannot fully repay its debt.

On March 14, 2002, the auditors told HGFin that they would place a "going concern" paragraph in HGFin's 2001 audited financial statements. A "going concern" paragraph is an expression of doubt whether the business will still exist in a year. Moreover, the accountants rejected a valuation of HGInc for debt impairment purposes done by CBIZ, which had valued HGInc's net worth at approximately $170 million. HGFin then ordered a loan impairment valuation from Deloitte and Touche, which valued HGInc at between $130–$140 million. This valuation was accepted by the auditors, but because the 2001 year-end debt owed to CI stood at approximately $144 million, the auditors were required to report that the intercompany loan was impaired. As a result, HGFin's 2001 audited financial statement included both a "going concern" statement and a "loan impairment" opinion for the outside auditors. This impairment opinion stated that the auditors had determined that HGInc could not repay $6.7 million of the $144 million 2001 year-end debt owed to CI.

In April 2002, the CI prospectus acknowledged the "going concern" opinion of HGFin's outside auditors and the loan impairment, but also referred to the CBIZ and Deloitte valuations. Inclusion of these valuations violated the terms of the contracts between HGFin and the two companies, which provided the valuations were not for public use and were to be used solely for financial reporting purposes in calculating loan impairment. Although there was evidence that the inclusion of these valuations was improper and misleading to the extent they suggested a reliable market price for HGInc, these references in the CI prospectus were approved by the Wyche firm, which did the securities work for HGFin and its subsidiaries.[5] Wyche attorneys testified they approved the reference to the CBIZ valuation, even though it had been rejected

5. Recall that appellant was acquitted of making false or misleading statements to the State Securities Commission.

by the outside auditor, and to the inclusion of both CBIZ and Deloitte valuations in the prospectus as indicative of HGInc's value, even in light of the explicit limitations on their use, on the theory it was management's view of a material fact.

Throughout 2002, HGFin struggled. Following a run on CI deposits in August 2002, the HGFin board, from which appellant had resigned as chairman in June 2002 but remained as a member, met with a bankruptcy attorney. This meeting included a discussion whether CI should be placed in a conservatorship or receivership. Appellant was also on CI's board. As for CI, only appellant and Sheppard, who were both on CI's board, were aware of this meeting at which the future of CI was discussed.

In mid–2002, HGFin had begun a search for a buyer for HGInc, the retail mortgage operation. HGInc's warehouse lines were being reduced or withdrawn as a result of the going concern opinion and the loan impairment opinion in the company's 2001 financial statement. HGFin officers misled CI's board into believing that legitimate outside buyers were interested in purchasing HGInc's mortgage business, when in fact no viable deal could be found. Recall that appellant was on both the HGFin board and CI's board. In November 2002, the HGFin board agreed to allow Sheppard to form a corporation (EMMCO) to buy the HGInc subprime mortgage business, and began talking about a possible receivership for CI. Sheppard resigned from the HGFin board at this juncture. The CI board members who were not also on HGFin's board were unaware for several weeks of this November 2002 plan to sell HGInc to the new Sheppard business venture.

Although the CI board was told that HGFin and HGInc were no longer taking money from CI in August 2002, in fact HGFin continued to use these funds to keep HGInc in business. In January 2003, appellant asked two CI board members, Earle Morris and Larry Owen, to meet him at a restaurant. Appellant told Morris and Owen that HGFin was looking into bankruptcy, but minimized the possibility. In February 2003, Larry Owen, president of CI and one of the CI board members who was at the restaurant meeting, learned from the state securities division that, in fact, HGFin

was still using CI investors' money to fund HGInc's obligations.

In March 2003, matters came to a head. During the week of March 17, 2003, HGFin was monitoring CI's money situation closely, requiring CI to frequently report deposits made, and transferring money only as needed for CI to pay investor redemptions. In a March 20 call to the CI board, Karen Miller, then CFO for HGFin, told the CI board that HGInc should have money available very soon that would ease CI's cash flow issues. Appellant, who had remained on the CI board, resigned that night. At 9 am on March 21, Miller called and informed CI that it would have only $84,000 for the day, and scheduled another CI board call for 2 pm. At that 2 pm call, the CI board was informed that HGFin was filing bankruptcy, and that CI needed to find an attorney to represent it. Both CI and HGFin ceased operations on that Friday, and both subsequently declared bankruptcy.

## ISSUES

1) Did the trial court err in permitting five CI investors to testify?
2) Did the trial court err in denying appellant's directed verdict motion?
3) Did the trial court err in charging the jury?

## ANALYSIS

### 1. Investor Testimony

Appellant contends the lower court erred in permitting five CI investors to testify. This issue is not preserved for appellate review.

The record contains a partial transcript from a hearing before Judge Johnson on September 7, 2007. In the course of this transcript, Judge Johnson is apparently reviewing pretrial motions, and states that he has before him a motion to exclude some "kind of invested [sic] testimony." Judge Johnson then says that "a determination of whether or not the testimony being tendered by a particular investor is relevant and I don't know that I can make that all without hearing what the

testimony is" and declines to rule on the motion at that juncture.

The record also includes "Defendant's Confidential Trial Brief for Judge Cottingham Only." This brief was presented to Judge Cottingham before the trial commenced on February 9, 2009.[6] This document contains this section:

### Investor Testimony

The State will likely attempt to introduce testimony from individuals who lost substantial sums of money invested in the notes and debentures of CII. However, it appears that none of these investor witnesses will testify that they ever spoke to or corresponded with Jack Sterling about their investments. In previous related trials, witnesses testified to false and misleading statements made to them by Larry Owen and Earle Morris. The investors also provided heart-wrenching testimony about the impact of their losses. The defendant's objection to such testimony is stated in our Motion to Exclude Irrelevant and Unduly Prejudicial Investor Testimony filed on August 24, 2007.

In summary, under Rule 403 of the South Carolina Rules of Evidence, the State should not be permitted to introduce emotionally charged and highly prejudicial testimony of investors who had no dealings with Sterling. Unless the State proves something more than a merely speculative connection between Sterling and the false statements of others, the testimony is not probative of Sterling's guilt. Since the defense is prepared to stipulate to the amount of investor losses flowing from the bankruptcy of CII and HomeGold, any probative value of testimony from an investor who had no dealings with Sterling is vastly outweighed by its unduly prejudicial impact, which would seriously jeopardize Sterling's right to a fair trial.

There is no mention of this document nor any objection to any investor testimony in the record. Shortly before this case was to be heard on appeal, appellant's appellate attorneys filed a motion to supplement the record with the affidavit of his trial attorneys, which this Court granted without prejudice to

---

6. Judge Johnson passed away before the trial.

our right to find no objection to the investors' testimony was preserved for appeal. The gist of this affidavit is that

> (1) the confidential trial brief was filed January 26, 2009; and
>
> (2) at trial, when the State proposed to call investor witnesses, trial counsel "strenuously objected to the admission of their testimony during one such in-chambers meeting...."

This affidavit does not: (1) clarify when the objection was renewed at trial, and since the CI investors did not testify sequentially, it is impossible to determine whether one or more testified without objection; (2) specify what arguments were raised in this *in camera* motion; or (3) reflect the basis for the trial court's ruling.

a) *Relevance*

■ Appellant argues that the testimony of the CI investors was irrelevant to the question whether he had the intent to defraud them, as they had never met or spoken with him. However, the State was required to prove that at least one investor lost money, and if appellant was convicted, his sentence would be determined by the amount of money lost. *See* S.C.Code Ann. § 35–1–508(a) (Supp.2010). The CI investors' testimony was not "wholly irrelevant."

b) *Impact evidence*

■ Appellant argued in his pretrial brief that the anticipated testimony of the investors about the impact of those losses on their lives, coupled with the testimony of the amount of the losses, was more prejudicial than probative and should therefore be excluded under Rule 403, SCRE. We agree that it appears evidence of the impact is irrelevant to appellant's criminal charges, but in this situation it is critical to know exactly what appellant's Rule 403 argument was and exactly why the trial judge exercised his discretion and permitted this testimony. While it appears that the CI investors' testimony should have been limited to the amount of their pecuniary losses, there is no evidence appellant sought to limit their testimony in this manner. Rather, from the record, it appears that he sought to exclude these witnesses from testifying at all. On this record, we are unable to find any error in the

trial judge's decision to deny appellant's request to disallow the CI investors' testimony. *E.g., State v. Freiburger,* 366 S.C. 125, 620 S.E.2d 737 (2005) (appellant's burden to present a sufficient record for appellate review).

## 2. *Directed Verdict*

At the close of the State's case, appellant made the following directed verdict motion:

*Attorney:* At this time, your Honor, we'd move for a directed verdict on all three counts, but particularly on the count of filing the letter to the [state] Securities Commission, because it was clear from the course, in the light most favorable to the State, that from all their witnesses all we've heard is that that letter was run by the Wyche firm, there was testimony the letter may have been authorized by the Wyche firm, no doubt advice of counsel and reliance, valid reliance on advice of counsel with fully informed counsel.

*The Court:* You're asking for a directed verdict as to what count?

*Attorney:* Count two, your honor.

*The Court:* Count two, be glad to hear from you.

*The State:* Thank you, your honor. I think Keith Giddens [7] said it was misleading and I think that's all we need to go to the jury.

*The Court:* Yes. The fact that there is some evidence from which the jury will consider as I rule on the motion for directed verdict, not the weight of it. I conclude that based on the totality of the facts that there is sufficient evidence to go forward on all counts, one, two and three.

*Attorney:* Your Honor, would you revisit that? We'll make the appropriate motions at the end of the full case.

*The Court:* No question about it, you're entitled to have it revisited in full.

*Attorney:* Thank you, your Honor.

7. Giddens began work at CI when it was purchased in 1991, was president of Emergent and HGFin, then HGFin's COO by the time of the merger with HomeSense. He left after the merger.

*The Court:* And I can handle it better at that time after hearing the defense anyway.

*Attorney:* Yes, sir.

At the end of the testimony, the following exchange occurred:

*The Court:* All right, sir. Any motions from the State at this time?

*The State:* None from the State, your Honor.

*The Court:* Any from the defendant?

*Attorney:* Your Honor, we'd renew our motions we made earlier at the end of the State's case for a directed verdict.

*The Court:* I accept those motions, and for the reasons previously stated, concluded that the issues to which you refer are questions of fact for the jury. As you well know, if there's some testimony on these various counts, that I'm obligated to send it to the jury. The jury's concerned with the weight of it. And there is sufficient evidence in the case to go forward. Your motions are respectfully denied.

*Attorney:* Thank you, your Honor.

*Second Attorney:* Your Honor, may I add one more motion to [Attorney's] motion?

*The Court:* Yes, sir.

*Second Attorney:* As to count two, we want to specifically ask the Court to dismiss count two regarding false statements to the[state] Securities Commission on the grounds that the indictment failed to allege the essential element of willfulness, and the grand jury did not pass on that essential element, and therefore it's not a criminal offense and the count should be dismissed.

*The Court:* I anticipated your motion, and as I looked at count two count one, and count one specifically designates the word "willful." And count one is a part of count two. Would you like to be heard on that?

*The State:* Yes. We did incorporate the previous paragraph in the count.

*The Court:* That is incorporated in there and the word "willful" is contained therein. Again, thank you for call-

ing that to my attention, but that motion for the reasons stated also is respectfully denied.

A directed verdict is properly denied where there is any evidence, direct or circumstantial, which reasonably tends to prove the defendant's guilt. *State v. Brandt*, 393 S.C. 526, 713 S.E.2d 591 (2011). When reviewing a denial of a directed verdict, "an appellate court views the evidence and all reasonable inferences in the light most favorable to the State." *Id.* (citation omitted). A general directed verdict motion, however, does not preserve any issue for appeal. *State v. Bailey*, 298 S.C. 1, 377 S.E.2d 581 (1989).

At trial, the only count for which appellant identified deficiencies in the State's case was count 2, one of the two charges of which appellant was acquitted. There is no proper directed verdict issue concerning count 1 preserved for our review. *State v. Bailey, supra.* In any case, had a proper motion been made, it should have been denied. Appellant's indictment specifies numerous ways in which he is alleged to have violated § 35-1-501(3). In order to withstand appellant's directed verdict motion on count 1, the State need only have presented some evidence to support any one of these allegations.

Paragraph 32(i) of the indictment alleges that after appellant learned that the outside auditors were going to place a going concern statement and loan impairment in HGFin's audited 2001 financial statement, which would then be included in CI's 2002 prospectus, he

... met with officers, directors and employees of [CI], several of which were investors in [CI] securities, in an effort to downplay negative information concerning the company and put a positive spin on [HG]'s speculative efforts to return to profitability. [Appellant] knew the misleading information shared with the officers, directors and employees of [CI] would be disseminated to potential or current investors in [CI] securities.

As explained below, the State presented evidence that appellant, "directly or indirectly ... engage[d] in an act ... that operate[d] ... as a fraud or deceit upon another person" in violation of § 35-1-501(3) in connection with this meeting.

Larry Owen, the president and long-term board member of CI, testified that he felt enormous pressure to "embellish" once he learned the 2002 CI prospectus would contain both going concern and impaired loan statements. Appellant asked Owen to set up a meeting with the CI board members and CI's staff in early April 2002. Appellant decided that the CI employees ("investment counselors") who dealt with CI's customers would need a summary to help them understand how to explain the prospectus.[8] Owen and appellant discussed the information to be included in this document, which Owen typed up and his wife handed out at the meeting.

Appellant, Owen, and an HG officer spoke at this meeting. The investment counselors were told to play up the positives in the prospectus, including the valuations done by CBIZ and Deloitte of HGInc's financial worth. Recall that these valuations were specifically restricted to private use to determine loan impairment only. As Owen explained, the point of the memorandum and meeting were to simplify and minimize the negative financial information in the prospectus because:

> [Y]ou know, most of our counselors had money there and their families had money there and their friends had money there and I knew if just the slightest conveyance of something negative like that was spilled, then it could cause a run.

Appellant helped prepare the memorandum by discussing most of its contents, and he was present at and participated in the meeting. There was evidence that the purpose of the April 2002 meeting and the memorandum was to divert the attention of investors (including the investment counselors present) from the grim news in the prospectus by directing it to the optimistic projections and valuations after having pointed out the impairment and going concern paragraphs. Indeed, an investment counselor testified that she left the meeting "feeling that the going concern language was not something that was that dire," at least in part because it had been emphasized that if HGInc were sold for the appraised

---

8. Former HG Board member Porter Rose, once Chief Investment Officer for Liberty Life and current partner in a private equity firm, testified that it is unlawful for a company to explain its prospectus to investors.

values placed upon it by CBIZ or Deloitte, CI investors would be paid in full. This investment counselor left her $80,000 in CI, and lost it all when the business closed.

The State presented sufficient evidence to withstand any directed verdict motion on count 1, as the jury could have found from this evidence that appellant knew the misleading information he shared at the April 2002 meeting would be disseminated to "investors" as charged in ¶ 32(i).

Appellant did not properly preserve any directed verdict motion as to count 1. *State v. Bailey, supra.* Moreover, as there is evidence that he "engaged in an act that operated as a fraud or deceit upon another person" in violation of § 35–1–501(3), had the issue been raised, the trial judge would have been correct in denying a directed verdict on count 1.

### 3. *Jury Charge*

South Carolina law makes it unlawful for an individual to either directly or indirectly "engage in an act, practice or course of business that operates or would operate as a fraud or deceit upon another person in connection with the offer, sale, or purchase of a security." § 35–1–501(3). An individual who willfully violates this statute is punished in accordance with the provisions of § 35–1–508; *see* § 35–1–501 cmt. 6, "The culpability required to be pled or proved under section 501 is addressed in the relevant enforcement context ... e.g. section 508 ... where "willfulness" must be proven...." Conduct is willful within the meaning of § 35–1–508 if the person acts intentionally, that is, he is aware of what he is doing. Willfulness does not require that the person act with an evil motive or with the intent or knowledge that the law, in this case § 35–1–501(3), is being violated. § 35–1–508 cmt. 2.

Thus, in order to violate the statute there must be evidence that the defendant's conduct was willful or intentional (§ 35–1–508) and that he did something that would or did operate as a fraud or deceit on another person (§ 35–1–501). Knowledge or intent that his conduct violated the securities law is not required (cmt.2, *supra* ) but the State must present evidence that the defendant made statements or committed acts that he knew presented a danger of misleading an investor. *State v. Morris,* 376 S.C. 189, 656 S.E.2d 359 (2008). In

*Morris,* this Court approved a jury charge on *mens rea* under these code sections that informed the jury it could find the defendant guilty if it found he knowingly committed misconduct, or if his actions "presented a danger of misleading buyers or sellers that is either known to [defendant] or is so obvious that [defendant] must have been aware [that it was misleading]." We found no error in charging the jury that it could find the defendant guilty if his misleading acts were either intentional or severely reckless, that is, he knew his conduct could mislead investors. *Id.*

Appellant's jury was charged:

[A] material element of the securities fraud prosecution is the demonstration of the existence with [sic]what is called scienter. Scienter is a mental state embracing intent to deceive, manipulate or defraud. Mere negligence will not suffer [sic] for conviction. Allegations of scienter must be based on a substantial factual basis in order to create [sic] strong inference that the defendant acted with the required state of mind as required [sic]. I would further charge you that scienter may be established by a showing of knowing misconduct or severe recklessness. Proof of such recklessness would require a showing that the defendant's conduct was an extreme departure of [sic] ordinary care which would present a danger of misleading buyers or sellers that is known to the defendant or is so obvious that the defendant must have been aware of it.

Following the charge, appellant objected to the severe recklessness language as it related to count one on the ground the charge (1) is inconsistent with the statutory definition of intent and conflicts with federal authority; and (2) effectively lowers the burden of proof, violating both a defendant's right to a fair trial and due process. The objection was overruled on the basis that the charge was taken directly from the case of *State v. Morris, supra,* which this Court had recently affirmed. Appellant lodged no further objection to the charge, nor did he object to the trial court's remedies when the jury subsequently sought clarification of the charge.

We first address the issues raised at trial. Neither § 35–1–501 nor § 35–1–508 includes the word 'intent,' and we therefore do not understand the contention that the *Morris* charge

is inconsistent with a statutory definition. We are within our authority to determine the level of intent required for a violation of the securities statute because the legislature did not specify any *mens rea*. *Morris, supra; State v. Jefferies,* 316 S.C. 13, 446 S.E.2d 427 (1994). Moreover, in *Morris,* we held that because the General Assembly did not specify the requisite *mens rea* for a violation of the securities law, we should not weaken the legislators' decision to criminalize the making of these types of false or misleading statements by imposing a high standard of intent. *Id.* at 201–202, 656 S.E.2d at 366.

In *Morris,* we construed the statute making it unlawful to engage in conduct that operates as a fraud or deceit upon another person (§ 35–1–501) with the statute (§ 35–1–508) that criminalizes an unlawful violation of § 35–1–501. In so doing, we were guided by the official comments to § 35–1–508, which informed us that willful means only that the person's conduct was intentional, not that his state of mind was evil or that he intended to violate § 35–1–501.[9] 'Recklessness' is one level of criminal intent, as are 'knowledge and negligence.' *State v. Jefferies, supra.*[10]

---

9. The dissent conflates the conduct standard (willfulness) with the mens rea standard. *See e.g., State v. Reid,* 383 S.C. 285, 679 S.E.2d 194 fn. 2 (Ct.App.2009) ("generally a crime includes both an actus reus component and a mens rea component"). Here, the jury was charged that Sterling could only be convicted if he were found to have acted "knowingly, intentionally, and willfully." The jury was also charged that if Sterling's conduct was done by mistake or accident, or any reason other than willfully, he could not be convicted. What is at issue here is not whether Sterling acted intentionally, but whether his mental state met the *mens rea* standard we created in *Morris,* that is, did he know, or was it so obvious that he must have known, that the information he disseminated presented a danger of misleading buyers or sellers. The dissent conflates the conduct/*mens rea* standards and concludes that "A person must therefore act knowing his conduct will operate as a fraud upon another, not simply consciously disregard the risk that his conduct may do so." This blending of conduct and *mens rea* is directly refuted by cmt. 2, "Proof of evil motive or intent to violate the law or knowledge that the law was being violated is not required" for a criminal conviction under § 35–1–508(a); *see also* cmt. 6 § 35–1–501.

10. The dissent also expresses concern that the *Morris* charge allows a conviction upon a showing of mere criminal negligence, despite a specific charge that mere negligence is not a sufficient basis. The *Morris* charge permits a conviction not upon an accidental creation of

Under *Jefferies*, intentional connotes a higher sense of awareness than mere recklessness. In *Morris*, we approved a charge that equated knowingly with severe recklessness. While severe recklessness is not a common criminal *mens rea* standard, under the charge approved in *Morris*, severe recklessness means simply that one cannot escape liability by "shutting one's eyes to what would otherwise be obvious." This is a longstanding tenet of criminal law. *See State v. Thompkins*, 263 S.C. 472, 211 S.E.2d 549 (1975). Appellant's charge did not violate any statutory definition of intent. Further, we find no constitutional infirmity in the charge approved in *Morris* and given here. In addition, we note that appellant has not sought to argue against the *Morris/Jefferies/Thompkins* precedents. Finally, appellant's reliance on federal authority is misplaced, as we are interpreting only our state securities statutes. The trial judge committed no error in overruling appellant's only objections to the jury charge.

■ On appeal, appellant seeks to raise additional challenges to the jury charge. It is axiomatic that a party may not change his grounds of objection on appeal. *E.g., State v. Meyers*, 262 S.C. 222, 203 S.E.2d 678 (1974). We therefore address these arguments only briefly.

First, appellant contends he is arguing about the absence of a "willfully with bad purpose" charge. Under our securities act, "proof of evil motive or intent to violate that law" is not required. *See* cmt. 2 to § 35-1-508; *State v. Morris, supra.*

Appellant also complains that the jury charge given in connection with count 1 was confusing, and refers to the jury's

---

an unknown risk, but only upon intentional acts that the defendant knew or must have known would cause harm. That standard most closely resembles our definition of knowingly: "One who shuts his eyes to avoid knowing what would otherwise be obvious" is said to act knowingly, not recklessly. *State v. Thompkins*, 263 S.C. 472, 211 S.E.2d 549 (1975). In *State v. Taylor*, 323 S.C. 162, 473 S.E.2d 817 (Ct.App.1996), the court relied upon the Model Penal Code's definition of criminal negligence, that one acts with criminal negligence when he "inadvertently creates a substantial and unjustifiable risk of which he ought to be aware." *Id.* at 166, 473 S.E.2d at 818. Here, the jury was charged that accidental or mistaken disclosure of information, i.e. inadvertent, which creates a risk, is not a violation of the statute. *Morris* does not permit a conviction based upon mere criminal negligence.

repeated requests for clarifying instructions. At trial, however, appellant never raised the issue of the jury's apparent confusion, nor did he seek to have the trial judge alter his response to the jury's inquiries or object to the accuracy or sufficiency of these responses. Had he done so, he would have given the trial court the opportunity to alter the charge in some way. Having failed to raise any objection at trial, appellant cannot now do so on appeal. *E.g., State v. Hale*, 284 S.C. 348, 326 S.E.2d 418 (Ct.App.1985).

Appellant now argues that the ruling in *Morris* upholding the jury charge on severe recklessness is dicta because the Court also held that the evidence showed Morris intentionally misled investors, and therefore Morris was not prejudiced by the charge even if it were improper. Appellant's argument admits too much: as was the case in *Morris*, there is abundant evidence that appellant intentionally engaged in acts, procedures, and a course of business that operated as a fraud or deceit upon others. Accordingly, even if we were to now alter or abandon the charge, appellant could not show any prejudice warranting relief.

## CONCLUSION

Appellant's conviction and sentence are

**AFFIRMED.**

TOAL, C.J., BEATTY, J., and Acting Justice JAMES E. MOORE, concur. HEARN, J., concurring in part and dissenting in part in a separate opinion.

Justice HEARN.

Respectfully, I concur in part and dissent in part. I agree with the majority that Sterling's challenges to the circuit court's denial of his motion for a directed verdict and the admissibility of investor impact testimony are not preserved for review.[11] However, I agree with the argument Sterling made at trial and in his brief that the court's charge lowered the *mens rea* for a conviction of securities fraud.

---

11. Nevertheless, I am troubled by the prejudicial nature of the investors' testimony regarding the impact their losses had on their lives and families.

The charge given to Sterling's jury was culled from our decision in *State v. Morris*, 376 S.C. 189, 656 S.E.2d 359 (2008). The language in the instant case to which Sterling objects reads as follows:

I charge you that a material element of the securities fraud prosecution is the demonstration of the existence of what is called scienter.[12]

Scienter is a mental state embracing intent to deceive, manipulate or defraud. Mere negligence will not suffer [sic] for conviction. Allegations of scienter must be based on a substantial factual basis in order to create a strong inference that the defendant acted with the required state of mind as required [sic].

I would further charge you that scienter may be established by a showing of knowing misconduct or severe recklessness. Proof of such recklessness would require a showing that the defendant's conduct was an extreme departure of ordinary care which would present a danger of misleading buyers or sellers that is known to the defendant or is so obvious that the defendant must have been aware of it.

When broken down, this charge permitted the jury to convict Sterling based on any one of three different levels of intent: (1) knowing misconduct; (2) conscious disregard of a known risk; or (3) disregarding a risk that Sterling should have known about, but did not. My objection to the charge is twofold. First, I believe the charge approved by the Court in *Morris* sanctioning a conscious disregard standard was erroneous and thus the circuit court here did not correctly charge the jury on the law of securities fraud in South Carolina. Second, assuming the correctness of *Morris* charge, the circuit court's charge in this case permitted a conviction upon a "should have known" standard, which is an even lower *mens rea* than that sanctioned by *Morris*. I would therefore reverse and remand for a new trial.

---

12. Although no party has objected to the circuit court's inclusion of scienter as an element of securities fraud, the *Morris* Court held the "statutory scheme expressly forecloses" this requirement. 376 S.C. at 202 n. 5, 656 S.E.2d at 366 n. 5. As discussed below, however, I do believe a prosecution for securities fraud necessitates a showing of intent to defraud.

## I.

In *Morris,* this Court held that knowing and intentional conduct is not required for a conviction of securities fraud. This holding was grounded in its belief that Section 35–1–508(a) of the South Carolina Code (Supp.2010)[13] did not specify a necessary level of intent. 376 S.C. at 201, 656 S.E.2d at 366. Thus, the Court was "extremely reluctant to draw such [a] distinction[ ]" itself. *Id.* However, this central premise to *Morris* is erroneous because section 35–1–508 does, in fact, specify a *mens rea* requirement: it expressly states that a person must act willfully. *See* S.C.Code Ann. § 35–1–508(a) (Supp.2010) ("A person that wil[l]fully violates this chapter . . . .").

As the comments to section 35–1–508 provide, willfulness requires "proof that a person acted intentionally in the sense that the person was aware of what he or she was doing. Proof of evil motive or intent to violate the law or knowledge that the law was being violated is not required." *Id.* cmt.2. Willfulness in this context thus goes

> no further than to denote that the actor had a purpose or willingness to commit a particular act or omission, in which case there is no requirement that the actor specifically intended to violate the law or injure another. In that event, the term "willful" requires only that the prohibited act occur intentionally, and merely implies that a person knows what he or she is doing, intends to do what he or she is doing, and is a free agent. Under this view, the essence of willfulness is that the actor be aware of what he or she is doing, which is to say that his or her actions are intentional, in contrast to that which is thoughtless or accidental.

21 Am.Jur.2d *Criminal Law* § 130 (2011). When read with section 35–1–501(3), section 35–1–508(a) consequently criminalizes actions taken by a person who knowingly and intentionally

---

13. Section 35–1–508(a) is the vehicle for criminal prosecution for violations of Section 35–1–501 of the South Carolina Code (Supp.2010). Sterling was indicted for violating section 35–1–501(3), which provides that "[i]t is unlawful for a person, in connection with the offer, sale or purchase of a security, directly or indirectly, . . . to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person."

engages in an act, practice, or course of business that operates as a fraud upon another person.

*Morris,* however, held that a conviction for securities fraud will stand when the defendant either intentionally misled investors or he "knew there was a danger that his conduct would mislead investors." 376 S.C. at 201, 656 S.E.2d at 365. The Court therefore approved of a recklessness-based conscious disregard standard: the defendant knew there was a risk his statements could mislead investors, but he proceeded anyway. 21 Am.Jur.2d *Criminal Law* § 127 ("Recklessness involves a subjective realization of a risk of a particular result and a conscious decision to ignore it, but it does not involve intentional conduct, because one who acts recklessly does not have a conscious objective to cause a particular result."); *see also State v. Rowell,* 326 S.C. 313, 315, 487 S.E.2d 185, 186 (1997) (noting that recklessness "connotes a conscious failure to exercise due care or ordinary care or a conscious indifference to the rights and safety of others or a reckless disregard thereof"). Thus, intentional conduct is not required to convict under this standard. Instead, the actor must merely be aware his actions *could* mislead and yet still engages in them.

Based on my reading of the statute, I believe this charge does not state the appropriate *mens rea* under section 35-1-508(a). Contrary to the Court's holding in *Morris* and the majority's position in this case, intentional and knowing conduct is required for criminal securities fraud. A person must therefore act knowing his conduct will operate as a fraud upon another, not simply consciously disregard the risk that his conduct may do so. While *Morris* may have a persuasive policy rationale in that a person should be prohibited from acting when he knows of the danger, it is not found in the language of the statute.

As to the majority's contention that my analysis conflates the concepts of the mental state required for one's conduct and *mens rea,* I do not dispute this as I see no meaningful difference between the two. Indeed, the majority's reference to *State v. Reid,* 383 S.C. 285, 679 S.E.2d 194 (Ct.App.2009), validates my position. It is hornbook law that most crimes require both an *actus reus* and a *mens rea. See id.* at 293 n. 2, 679 S.E.2d at 198 n. 2. Section 35-1-501(3) provides the *actus reus* for this type of securities fraud, *viz.* engaging in

conduct that operates as a fraud upon another in connection with the sale of securities. Section 35–1–508(a), in turn, supplies the *mens rea* by stating a person must do so willfully. The majority, however, holds that a person must willfully defraud another when selling securities (the majority's *actus reus* ), but he may be convicted for doing so recklessly (the majority's *mens rea* ). Putting aside the conflicting levels of intent under this view, it is only by combining the *mens rea* and *actus reus* requirements found in sections 35–1–501 and 35–1–508 into one *actus reus* can the majority find room for recklessness in the resulting vacuum. Willfulness in the criminal context, however, is not a type of conduct but instead is unmistakably one of the graduated levels of mental intent. These two statutes therefore provide both the requisite *actus reus* and *mens rea,* and I do not believe we as a Court have the opportunity to predicate a conviction for securities fraud upon anything else.

It may be that our disagreement emanates from the confusion occasioned by the statute as to the nature of securities fraud. Comment 2 to section 35–1–508 states that "[p]roof of evil motive or intent to violate the law or knowledge that the law was being violated is not required" in a prosecution for violations of section 35–1–501. Section 35–1–501(3), however, prohibits "engag[ing] in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person" when done "in connection with the offer, sale, or purchase of a security." Thus, the very conduct proscribed by section 35–1–501(3) is fraud, an act which is evil in and of itself. *See Huff v. Anderson,* 212 Ga. 32, 90 S.E.2d 329, 331 (1955) ("It appears from the authorities to be the rule without exception, that the offense of obtaining money from another by fraud or false pretenses, or larceny after trust, are crimes *malum in se,* involving moral turpitude."). Proving that a person's *conduct* in contravention of section 35–1–501(3) was intentional, willful, and knowing (which the majority acknowledges is required) therefore necessitates the proof of an evil motive—an intent to deceive. Although section 35–1–508 suggests scienter is not required, the language in section 35–1–501 necessitates ʾfraud. Because section 35–1–501(3) is the more specific statute, I believe it controls and intent to defraud is necessary.

Accordingly, I believe *Morris* was wrongly decided and would reverse Sterling's conviction because the charge given was taken directly from it. I also believe Sterling was prejudiced by the court's incorrect charge. In my opinion, there is not "abundant evidence" that Sterling intentionally defrauded investors. Rather, there is a significant amount of evidence showing Sterling simply was blind to the risks he may have taken. Indeed, one juror sent a note to the court asking if Sterling could be convicted based only on severe recklessness, thereby arguably expressing his view that the State had not shown a course of intentional conduct.

## II.

Even if *Morris* did correctly hold that criminal recklessness is sufficient under section 35–1–508(a),[14] I believe the Court may have inadvertently sanctioned the use of a criminal negligence *mens rea* standard. The charge given in this case followed verbatim a portion of *Morris* wherein the Court quoted and tacitly approved of a charge which stated that a jury could convict upon finding the defendant took steps "which present[ ] a danger of misleading buyers or sellers that is either known to [the defendant] *or* is so obvious that [he] must have been aware of it."[15] 376 S.C. at 201, 656 S.E.2d at

14. Some authorities do suggest that this sort of criminal recklessness can satisfy the willfulness/intent element for securities fraud. *See United States v. Cassese*, 428 F.3d 92, 98 (2d Cir.2005); *United States v. Tarallo*, 380 F.3d 1174, 1189 (9th Cir.2004); *Sec. & Exchange Comm'n v. Steadman*, 967 F.2d 636, 641–42 (D.C.Cir.1992); *see also State v. Jarrell*, 350 S.C. 90, 98, 564 S.E.2d 362, 367 (Ct.App.2002) ("Extreme indifference is in the nature of 'a culpable mental state ... and therefore is akin to intent.' In this state, indifference in the context of criminal statutes has been compared to the conscious act of disregarding a risk which a person's conduct has created, or a failure to exercise ordinary or due care." (citations omitted)). *But see United States v. O'Hagan*, 139 F.3d 641, 647 (8th Cir.1998) ("[T]he statute provides that a negligent or reckless violation of the securities law cannot result in criminal liability; instead, the defendant must act willfully."). *Morris*, however, viewed these levels of intent as wholly separate. If this interpretation were to be adopted with respect to section 35–1–508(a), then *Morris* may have correctly held that recklessness is sufficient even if it did so for a different reason.

15. The author of today's majority did approve substantively of this charge in *Morris*, but he would not "endorse the instruction as a model

365. (emphasis added). This charge accordingly includes both a "known" and a "should have known" standard.

Crucial to the concept of recklessness is the notion that the actor must subjectively be aware of the risk, and one is not criminally reckless for acting despite a risk he should have known. 21 Am.Jur.2d *Criminal Law* § 127. In other words, liability for recklessness "cannot be predicated solely on an objective consideration of what a defendant 'should have known.'" *Id.* A hallmark of criminal negligence, on the other hand, is disregarding a risk one should have known about. *State v. Taylor,* 323 S.C. 162, 166, 473 S.E.2d 817, 818 (Ct.App. 1996); 21 Am.Jur.2d *Criminal Law* § 126 ("A person acts with criminal negligence when he or she should have been aware of a substantial and unjustifiable risk he or she has created."). Thus, a defendant's subjective knowledge of the risk is irrelevant for criminal negligence. 21 Am.Jur.2d *Criminal Law* § 126. Hence, the charge approved of in *Morris* includes both recklessness and the lower *mens rea* of negligence.

However, I do not believe the *Morris* Court actually intended to approve of criminal negligence as a permissible *mens rea* for securities fraud. Instead, I read *Morris* as only criminalizing acting with actual knowledge that one's conduct may mislead investors. Apart from this language, the Court never mentioned the negligence standard again. Notably, after quoting this "should have known" standard the Court wrote, "Stated differently, the court charged that in order to support a conviction, the jury needed to find that [Morris] intentionally misled investors, or that [Morris] knew that there was a danger that his conduct would mislead investors." *Morris,* 376 at 201, 656 S.E.2d at 365. Clearly, the Court believed the charge it was reviewing only concerned recklessness. It accordingly appears the Court unintentionally lowered the standard by implicitly sanctioning the "should have known" language when attempting to hold recklessness will sustain a conviction for securities fraud.[16] *See State v. Jefferies,* 316

---

charge." 376 S.C. at 211 n. 12, 656 S.E.2d at 370 n. 12 (Pleicones, J., concurring).

**16.** I believe the circuit court committed the same inadvertent error here. In charging the jury, the circuit court stated that "[m]ere

S.C. 13, 18, 446 S.E.2d 427, 430 (1994) (noting criminal negligence is a lower level of intent than criminal recklessness).

Furthermore, the Court's ultimate holding was a policy decision rooted in the notion that one should not be able to escape criminal liability for statements made with actual knowledge that they will mislead investors. *Id.* at 202, 656 S.E.2d at 366. However, this policy was limited by the Court to just acting with actual knowledge of the risk and did not embrace a situation where one should have known of the risk. I therefore read the Court's decision as only permitting a charge on recklessness, and the Court was neither asked to nor attempted to expand the net cast by section 35–1–508(a) to include negligence. Thus, the Court's references to the "should have known" standard are dicta. *See Ex parte Goodyear Tire & Rubber Co.*, 248 S.C. 412, 418, 150 S.E.2d 525, 527 (1966) (" '[G]eneral expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit . . . .' " (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 398, 5 L.Ed. 257 (1821))). I can also find nothing in section 35–1–508 itself which permits a conviction of securities fraud to stand on mere criminal negligence.

The majority today opines that the "should have known" language from *Morris* is not rooted in criminal negligence but instead is a species of knowing misconduct. After parsing the language of the charge, the majority's contention is that it sanctioned a willful blindness standard, not an accidental blindness one. While I may disagree with the majority's ultimate reading of the charge and whether it in fact states a willful blindness standard, there is an inherent danger in giving such a charge because it may permit the jury to slip down the slope into negligence. As the Fifth Circuit stated, "Because the instruction permits a jury to convict a defendant without a finding that the defendant was actually aware of the existence of illegal conduct, the deliberate ignorance instruction poses the risk that a jury might convict the defendant on

___

negligence will not suffer [sic] for conviction." However, the court repeated the same "should have known" language quoted in *Morris*.

a lesser negligence standard." *United States v. Lara–Velasquez*, 919 F.2d 946, 951 (5th Cir.1990).

> The source of this risk is the potential for confusion about the degree of "deliberateness" required to convert ordinary, innocent ignorance into guilty knowledge. The concern is that once a jury learns that it can convict a defendant despite evidence of a lack of knowledge, it will be misled into thinking that it can convict based on negligent or reckless ignorance rather than intentional ignorance. In other words, the jury may erroneously apply a lesser *mens rea* requirement: a "should have known" standard of knowledge.

*United States v. Skilling*, 554 F.3d 529, 548–49 (5th Cir.2009), *aff'd in part, vacated in part, and remanded,* —— U.S. ——, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010). While this charge may be warranted under certain facts, I do not find them present in this case.[17] Accordingly, the circuit court's charge here did not state the correct law in South Carolina and permitted the jury to convict Sterling based on criminal negligence.

Even if recklessness is enough for a conviction, I still find sufficient evidence in the record that Sterling was not aware of the risks he took to warrant a finding of prejudice. I would therefore reverse Sterling's conviction and remand for a new trial.

## III.

In sum, I would overrule *Morris* and hold that intentional and knowing conduct is required for a conviction of securities fraud. Because the charge given to Sterling's jury permitted a conviction on something less than willfulness, I would reverse and remand for a new trial. However, even assuming *Morris* correctly held that recklessness is sufficient for crimi-

---

17. In order to be warranted, the evidence adduced at trial must raise two inferences: "(1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." *Lara–Velasquez*, 919 F.2d at 951. While the evidence may permit the first inference, which would be in accord with reckless misconduct, I can find nothing in the record which demonstrates Sterling purposefully sought to avoid knowing what was going on.

nal securities fraud, the charge here incorporated criminal negligence, which is even lower than recklessness in the hierarchy of criminal intent. Although the negligence language used by the circuit court in this case came directly from *Morris,* I do not believe the *Morris* Court intended to adopt this standard. Accordingly, I would still reverse Sterling's conviction and remand.