# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Antwuan L. Nelson, Appellant.

Appellate Case No. 2017-001406

---

Appeal From Horry County
Larry B. Hyman, Jr., Circuit Court Judge

---

Opinion No. 5768
Heard May 27, 2020 – Filed August 19, 2020

---

## REVERSED AND REMANDED

---

Appellate Defender David Alexander, of Columbia, for
Appellant.

Attorney General Alan McCrory Wilson, of Columbia;
Assistant Attorney General Ambree Michele Muller, of
Lexington; and Solicitor Jimmy A. Richardson, II, of
Conway, for Respondent.

---

**HUFF, J.:** Antwuan Levon Nelson was indicted for murder, possession of a
weapon during the commission of a violent crime, and possession with intent to
distribute cocaine base. He appeals from his convictions for voluntary
manslaughter and possession of a weapon during the commission of a violent
crime, asserting the trial court erred in refusing to grant him a continuance or
declare a mistrial when his key defense witness was in the hospital. We reverse
Nelson's convictions and remand for a new trial.

## FACTUAL/PROCEDURAL HISTORY

### I.     The State's Presentation of Evidence

This matter stems from the shooting death of Michael Rogers (Victim) at an apartment complex where Victim lived.  The State presented witnesses who testified as follows:

On the afternoon of January 27, 2014, police officers responded to a shooting at some apartments at 37th Avenue North in Myrtle Beach.  Officers Mackin and Owens were the first on the scene, where they encountered numerous people who indicated a black male in the parking lot—wearing a black jacket and standing beside a red car—had just shot someone.  The officers observed Nelson leaning against the back of the vehicle, at which time they drew their weapons.  Nelson complied with their commands, and he was placed in handcuffs.  When they put Nelson on the ground, they observed an AR-15 rifle—with the magazine out—on the ground behind Nelson.

The scene was described as chaotic, with about forty people making threats and yelling at Nelson.  Some of the people told the officers that a bleeding victim was lying in the alley.  Officer Mackin stayed with Nelson while Officer Owens went to render aid to Victim.  Officer Owens testified there were probably a dozen people in the alleyway.  He observed a white female, who was crying and upset, with Victim.  Victim had a large bulge in his neck, and he was "bleeding out." Officer Owens attempted CPR, but he realized Victim had received a fatal blow. Victim died from a gunshot wound to the neck.

Officer Owens observed a shotgun lying close to Victim and observed two unfired shotgun shells, but no spent shells.  The shotgun shells were 12 gauge No. 8 birdshot.  Officer Owens stated the shotgun shells were close to Victim and the shotgun was across from him, next to a wall.  He agreed that the shotgun would spit the shell out automatically when fired and there was "no telling where it's going to kick it to."

Officer Garrett arrived as backup, encountering a large, irritated crowd of people. He testified he knew he needed to remove Nelson from the scene for his own safety.  Officer Garrett transported Nelson to the detention center, during which time Nelson told the officer "I shot him because he was going to shoot me."

When the officers arrived at the scene, Nelson's car was backed into a parking spot, and nothing was blocking the vehicle from leaving. Nelson was wearing clothing that was black and red trim, with red or black shoes. Officer Mackin acknowledged there were people standing all around the crime scene, and he did not know how long Victim had been lying in the alley and whether anyone had tampered with evidence prior to their arrival. However, he did not observe anyone running in and out of the alley or taking anything from there. Officer Owens testified he maintained the integrity of the scene as best he could until the Crime Scene officers arrived but stated it was difficult to do so before more officers arrived there.

Witness Michelle Cantey, who lived in a first floor condominium across from 37th Avenue North, testified she was in her unit around 4:30 on the afternoon of January 27, 2014, when she heard several shots and felt a reverberation in the building. A bullet entered her condo and embedded in an end table. Cantey heard the muffled sounds of neighbors talking outside and went to her window. When she looked out the window down an alley, she observed a black male in dark clothing with red trim on his jacket trying to reach the top of a fence. This person dropped something over the fence, which she assumed was a handgun since she had just heard the shots. After throwing the item over the fence, the man ran back toward a red car.

Officer Kenneth Harlow arrived on the scene with his K-9, Roscoe. Officer Harlow secured the AR-15 rifle that was in the area of the car. He found the rifle with the magazine out and also observed spent shell casings near a trash can. Upon learning something may have been thrown over a fence, he and Roscoe conducted an article search all the way down the fence on the opposite side of the apartments, retrieving a ball of saran wrap with a green leafy substance and white powder that looked like cocaine.[1]

Officer Rhett Ammons testified that when he arrived at the scene, he saw numerous irate people. Looking down the alley that runs behind the building, Officer Ammons observed a black male on the ground, with a white female and Officer Owens over him. He did not recall if there were other people in the alley. Officer Ammons testified that while looking down the alley he did not see anyone pick up any items and that nothing was picked up; however, he acknowledged "all

---

[1] The State presented evidence that the items found along the fence field sample tested positive for THC and cocaine. However, Nelson was ultimately acquitted of the drug charge.

the attention was to the victim." Officer Ammons stated he never saw anyone approach the shotgun that was in the alley, and no one picked up anything from the ground.

Crime Scene Investigator Michelle McSpadden collected the unloaded AR-15 rifle, and the magazine found next to it, at the back of the Crown Victoria car. Officer McSpadden testified the fired shell casings from a rifle were recovered by the side of trashcans. The State presented expert testimony that three .223 Remington caliber cartridge cases recovered from the scene were fired from the AR-15 rifle.[2] Officer McSpadden testified she spent quite a bit of time at the crime scene. She located a couple of places where a round could have struck: the hole in the wall of Cantey's home and a chip in the brick of the breezeway at the apartment complex that appeared to be fresh damage. In her examination of the alley, she found an unfired rifle round, an unloaded shotgun, and two unfired shotgun rounds that were filled with birdshot. She did not find any spent shotgun shells or any wadding from a fired shotgun shell. She also did not find any pellets or holes in the fence that looked like a strike from that kind of ammunition. She agreed, though, that such a shot would have to hit something for her to see physical evidence of a strike. Officer McSpadden also acknowledged she could not say that a shotgun shell was not removed from the scene; however, there was no evidence a shotgun had been fired. She reiterated she spent quite a bit of time at the scene and felt confident they would have seen evidence of a shotgun blast had it been there. Further, because birdshot contains dozens and dozens of pellets, it would have been difficult for someone to pick up every single one. Officer McSpadden also testified that she collected gunshot residue evidence from Nelson, and she checked Nelson for injuries. She stated she probably spent ten minutes looking at his hands and saw no injuries.

The State's Trace Evidence expert testified gunshot residue tests performed on Nelson and Victim revealed the presence of gunshot residue on Nelson's hands, but not on Victim's. She stated gunshot residue on a deceased person would remain on the hands until physically removed by an outside force. She acknowledged blood could dissolve the residue.

Kristen Bloomer, with whom Victim lived and shared a child, testified she was in the living room of her 37th Avenue North apartment in Myrtle Beach sometime

---

[2] The expert did not have enough evidence to conclusively say recovered bullets, or bullet parts, from Cantey's home and Victim's body were fired from the AR-15 rifle, but they were consistent with .223 Remington or 5.56 Nato bullets.

after 3:00 p.m. on January 27, 2014, when Victim and Nelson entered the home. As they went into the kitchen area, their demeanors were calm. However, Bloomer started hearing them speak in a hostile manner. When she stood up, she saw Nelson throw a punch at Victim. Bloomer heard Victim—who sold drugs on occasion—say, "No, I'm not buying these, it does not look correct." In response, Nelson said, "You will, you will buy these." Bloomer was under the impression that whatever was being bought was not up to the standard of what someone else would want to purchase. Once Nelson threw the punch and hit Victim, the two started scuffling in the kitchen. At some point, Victim was on the ground with Nelson on top of him continuing to hit Victim. Victim yelled for Bloomer to get his gun. Bloomer froze because of the situation that was occurring and also because she did not know where the gun was. She then opened the door and told Victim to hit Nelson and get him out of the home. Not long after she opened the door, Nelson "took off running and went out [her] front door and went down the stairwell out of the building." The gun that Victim told her to retrieve was a shotgun.

After Nelson fled, Bloomer tried to calm Victim down and get him to stay in the apartment, but that did not happen as Victim was furious from having been attacked in his own home. Bloomer and Victim started walking down the stairs of the building, passing Victim's son, Jerome, who was staying there at the time. The three stopped and talked for a moment and then proceeded around to the front of the building. Bloomer could not remember if Victim had a gun when he went down the steps. She estimated two to two and a half minutes passed from the time Nelson left her home until she went down the steps of the building. Victim ran down the steps and, after Bloomer walked down them herself, she saw Victim at the front of the building. Victim was still outraged and began "yelling up to the top of the stairs of the front building" for Nelson to "come on, come out, fight like a man." Bloomer testified Victim did not have a weapon in his hands at that time, and her impression was that he wanted to engage in a fist fight. Victim yelled for a few minutes and was not really calming down, but Bloomer realized it was getting close to the time they needed to pick up their child from daycare and convinced Victim to go with her. Before Victim, Bloomer, and Jerome walked back to their apartment, Victim grabbed a shotgun from the bed of his truck. Bloomer testified this was the first time she remembered seeing the shotgun. This occurred around 4:15 p.m., and it had been at least twenty minutes since the initial altercation.

After approximately five minutes in their apartment, Bloomer and Victim walked back to Victim's truck. Victim, however, decided to not accompany Bloomer to pick up their child, and he headed back to their apartment. According to Bloomer,

Nelson came down the stairs from the top of the building, crouched down, looked around for a second, and then ran to the trunk of his car. Nelson opened the trunk, stood up, closed the trunk, and approached Bloomer with a black rifle. He did not point the weapon at her. Nelson told Bloomer to call Victim and "tell him to bring him his stuff," but Bloomer told him she would not because her phone was about to die. Bloomer then walked away from Nelson and started to go back up to her apartment. As she did so, she heard the front door to her apartment building that led to the stairway shut, and she saw Victim walk against the edge of the building toward a small breezeway area with a shotgun in his hand. Bloomer saw Victim peek around the corner and duck back, and she heard shots. Jerome told Bloomer to come to him, and she went into the hallway area and stood with Jerome for 10 to 15 seconds, during which time she heard a few more shots. About 10 seconds after the shots stopped, Jerome went to check on his father. As Jerome reached the breezeway, he started yelling and screaming. Bloomer ran over to Victim, who was lying on the ground, and applied pressure to his neck where he had been shot. While Bloomer was on the ground with Victim, Nelson approached, taking apart his rifle and saying, "He threatened me first, he threatened me first." Bloomer told Nelson he needed to get away from her, and he walked away. By the time Nelson reached the trunk of his car, the police arrived on the scene.

One of the officers attempted CPR on Victim, and a woman also tried to help Victim, after which EMS arrived. Bloomer stated she did not see anyone disturbing the scene or taking anything away from the scene, noting officers were "pretty quick at securing the alleyway." Bloomer also denied taking any fired shotgun shells out of the scene. When asked if she believed Victim fired the shotgun, Bloomer stated, "I really don't know." She testified she could not differentiate between sounds. She saw Victim with the shotgun and observed him peek out and duck back down, but she "[could not] really say whether or not [she] saw him take a shot or not." Bloomer acknowledged that in her statement to police, she told them she believed Victim shot the shotgun. Bloomer clarified that she saw Victim with the gun and heard the gunshots, so at the time she presumed he did. However, she could not say for sure that he did or did not. Bloomer believed she heard a total of three to four shots that were "[p]retty quick together." She could not say if any of the shots sounded different. Bloomer estimated thirty to forty-five minutes passed between the time Nelson came into their apartment with Victim and the time that Victim was shot.

Bloomer admitted that, after the physical fight between Victim and Nelson, she assumed law enforcement would be coming to the home and, because she did not want her child taken from her in the event officers found drugs in the residence,

she took drugs and paraphernalia from the home and put them in Victim's truck. She did not know if the drugs belonged to Victim or to Nelson, but she had not seen them in the apartment prior to Nelson being there. When asked on cross-examination whether Victim shot at Nelson when Nelson first ran from her apartment and ran around the building, Bloomer replied she could not say, because she was in her apartment and Victim "ran out before me." Bloomer did not recall seeing Victim take his shotgun to someone else's apartment looking for Nelson. She also did not remember pointing to Nelson and saying to Victim, "Here he is" when Victim came downstairs. However, after being confronted with her statement, Bloomer agreed that she said that in the statement. She agreed that she told the officer in her statement that she really should not have done that, because she knew Victim was looking for Nelson to shoot him. She testified, though, that she did not remember saying that either. Bloomer acknowledged that she said in her statement that she and Victim were outside "waiting" the first time when Victim was yelling up to Nelson. When asked what they were waiting for, Bloomer stated, "who knows," and "[f]or him to come down and duke it out like a man, that is what [Victim] was saying." She further acknowledged telling the officer in her statement that she did not see who swung first between Victim and Nelson.

## II.    Defense Motion

Following the presentation of this evidence on June 14, 2017, the State rested. Defense counsel informed the trial court it had an issue with two witnesses—Lillian Brockington and Tom Davis—who were under subpoena and were not in court. Counsel noted that Brockington was in a Georgetown hospital. Counsel acknowledged he had not complied with Rule 7, SCRCrimP, at that point by providing an affidavit concerning the expected testimony explaining, with respect to Davis, he expected him to be there. When the court asked what counsel wanted it to do, he replied he would like to recess for the afternoon to get his witnesses lined up. However, counsel noted he still had one witness present he could call that day. The solicitor "defer[ed] to the Court," noting it was "important for this man to get a defense." Preferring to begin the defense's case in the morning rather than to hear from one of its witnesses that afternoon, the trial court adjourned early that afternoon and instructed the parties to be ready at 9:30 the next morning.

When court resumed on June 15, defense counsel presented the court with an affidavit pursuant to Rule 7(b) concerning the unavailability of witness Brockington. The affidavit by defense counsel provided that Brockington was a material and indispensable witness whose testimony could not be attained. It

explained she was subpoenaed for the court proceeding at Georgetown Memorial Hospital where she was a patient, suffering from sickle cell anemia and awaiting blood transfusion. Counsel further averred that if Brockington could attend the trial, she would testify consistently with her pre-trial statement given to the Myrtle Beach Police Department. The affidavit provided defense counsel was not intentionally attempting to delay the proceedings, but he did not believe he could safely try the case without Brockington's testimony. Counsel attached a copy of Brockington's statement to police to the affidavit, as well as a hospital statement indicating Brockington was admitted to the hospital on June 13, 2017, and she would remain there until released by a doctor.[3] Counsel acknowledged he did not have Brockington subpoenaed when the trial started. When asked what he wanted the court to do, counsel requested a mistrial, citing in particular the substance of Brockington's statement that Victim came to her apartment with a shotgun looking for Nelson and that Victim shot at Nelson.

The solicitor argued Brockington was not hospitalized until the second day of trial and was not served with the subpoena until after that. He maintained the unavailability of a witness was not a ground for a mistrial. The trial court observed defense counsel had notice of this case being tried and this was the fourth day of trial. Defense counsel explained, however, that Brockington was going to appear voluntarily, he did not know Brockington was going into the hospital, and he approached the court when he first learned she was not there on the first day of trial but he did not think at that time she had been taken to the hospital. Defense counsel noted the importance of the substance of Brockington's testimony, particularly considering what the jury would be charged as to mutual combat,

---

[3] Though not clear, it appears from the record that the trial started on June 12, 2017, with jury selection and a pre-trial hearing likely occurring on that date; opening statements and the presentation of the State's witnesses began on June 13 and concluded on June 14; after the State rested on June 14, the defense raised concern about the absence of two of its witnesses; and the court adjourned early that day. When court resumed on June 15, the defense made motions relative to the unavailability of witness Brockington. Defense counsel's affidavit indicates a subpoena was served on Brockington while she was a patient at the hospital, and the hospital note indicates she was admitted on June 13, 2017. Defense counsel informed the court he believed the subpoena was served on Tuesday after the case started. June 13, 2017, fell on a Tuesday. Accordingly, it would appear that is when the subpoena was served on Brockington.

voluntary manslaughter and self-defense, and he asserted her testimony was credible.

The solicitor argued the only issue as it related to Brockington's presentation of the facts was her claim that Victim shot first, but her statement indicated she was not in a position to actually see that. The solicitor did not believe there would be substantial prejudice to defense counsel's presentation of facts because he had evidence in the record to argue what Brockington would be able to offer. Further, the solicitor argued he would be able to show Brockington's bias, and her statement was internally inconsistent on the facts. Defense counsel countered that the solicitor argued issues that went to credibility, and Brockington's credibility was an issue for the jury. He argued there were key issues concerning: who shot first; when Victim had his gun; and whether Victim went to Brockington's apartment looking for Nelson with a shotgun.

The trial court ruled as follows:

> [Y]our motion for a continuation is denied. . . . I mean your motion for a mistrial is denied. I will not continue the case. According to this affidavit, she was not served with a subpoena until, when, Tuesday — — Wednesday?
>
> . . .
>
> After this case started. . . . You've had that statement for quite some time, and you knew this case was scheduled for quite some time, and now we're in the third, fourth day of it. I looked at her statement, and what I can see here are things that have been testified to. We've heard testimony that the victim in this matter did arm himself, did have a gun. . . . [Y]ou have a witness . . . who you say will testify that he actually shot the shotgun. . . .
>
> This case boils down to self-defense and mutual combat. There is nothing I've seen in her statement that cannot be confirmed or has not been confirmed or is not in dispute in this. So I'm going to deny your motion to postpone or continue this case, or to grant a mistrial.

## III. The Defense's Presentation of Evidence

The defense recalled Bloomer to the stand.  She agreed that in her statement to police, she said she heard Victim shoot at Nelson and that the first shot she heard was Victim shooting at Nelson.  However, she maintained she could not, looking back, necessarily say that occurred.  Bloomer testified that after the initial shot, she heard three or four shots.  Bloomer testified her statement said, "The next thing I know I heard him shoot.  I saw him do a duck-back to avoid a shot or something like that back into the alleyway. . . ."  When asked during the police interview where she was when the shots were being exchanged, Bloomer's response was, "The first time I was right here and I saw one of [Victim's] shots."  Bloomer maintained the statement did not explicitly say what she saw, and it could have been an indication of what she saw or heard, noting her position was such that she could not have seen the "additional shots fired that [she] heard."  On cross-examination by the solicitor, Bloomer testified that when she initially heard the shots, the only person she could see with a gun was Victim, and she could not say for sure whether or not he fired the first shot.  Her perception of the gunshot sound and seeing Victim peek out and duck back was what made her tell law enforcement that Victim fired a shot.  However, she did not recall seeing Victim bring the shotgun to his shoulder or see him squeeze the trigger or see a flash come out of the barrel.  Bloomer testified that after the initial scuffle between Nelson and Victim, over the course of the next forty-five minutes or so Nelson did not retreat or leave.  She also stated that ten to fifteen minutes elapsed with Victim waiting downstairs yelling for Nelson to come out and fight like a man, and until that point, no one had seen a gun.  Victim then took the shotgun out of his truck as they headed back upstairs and, at that point, Victim was retreating, leaving the situation and deescalating it.  When they thereafter came back downstairs to go pick up their child, Bloomer claimed Victim did not have a weapon.

The defense also presented Thomas Davis as a witness.  Davis, who owned an apartment building on 37th Avenue North, testified he received calls from tenants about a shooting and the presence of police cars when this incident occurred.  Davis went to the area to see if there was any damage to his property and to talk to law enforcement.  Davis stated he spoke to a City of Myrtle Beach police officer about damage to a backdoor, where five or six of the windowpanes had been shot out and there were several holes in the wooden door.  Davis also testified he owned several guns, he specifically owned a shotgun, he had done a lot of shooting and, though he could not tell what kind of shotgun shot it was, the damage to the wood looked like it came from No. 8 birdshot.  Davis clarified he could not say whether it was 8, 10 or 12 gauge buckshot, and he "just threw out No. 8 because [he] knew it was small caliber."

## IV. Information Contained In Brockington's Statement Pertinent to Nelson's Defense

Brockington's statement, attached to defense counsel's Rule 7 affidavit, shows she gave the statement at 6:34 p.m. on the day of the shooting. It reflects in pertinent part as follows: Brockington told the police that she was a witness to some of the shooting incident. When Nelson—who is the cousin of Brockington's husband— "came down," she heard the guy that got shot (Victim) say "here we go babe, here we go babe," and he "got his gun and shot at him." Brockington clarified it was Victim's girlfriend who said "here we go babe, here we go babe," and Victim got his gun and he shot at Nelson first. After Victim shot first, "he shot back and then he shot again and then he shot back and that's when [Victim] got hit." Brockington thought she heard four total shots. Brockington also stated that Victim had run upstairs to Brockington's apartment with his shotgun at some point, looking for Nelson. Brockington told Victim that Nelson was not there, and Victim went back downstairs. When Nelson came out, that's when Victim's girlfriend hollered "here you go babe, here you go babe." The next thing Brockington heard was a shot fired at Nelson, then Nelson fired back at Victim. Brockington stated, "[H]e must have missed and then shot again that got shot, shot again, and then he shot again."[4] When asked if she saw this happen, Brockington stated "I was in my window." When asked where she saw Victim standing when she saw him shoot, Brockington stated he was in the back in the alleyway "shooting at him because he was going to his car." When asked how she could see him while looking out her window toward the street, Brockington clarified that she did not see him; rather, she heard a shot in the alleyway first. When the shot went off, she saw the guy at the red car duck. When asked if Nelson already had the long gun in his hand, Brockington replied, "No, he was at his trunk when the dude was shooting at him, he was getting his gun I guess to shoot back. Once he got it together he shot back and missed and then the other dude shot again, and then he shot again." Brockington did not see Nelson going to his trunk, but he had the gun in his hand when she looked down and that is when she heard the first shot. Before the shot went off, the girlfriend "must have seen" Nelson so she hollered "here we go babe, here we go babe." Brockington then heard the shot, looked and saw "him" shoot back, and then she heard another shot. When asked if she was certain the first shot came from the alleyway, Brockington stated, "It

---

[4] The phrase "that got shot" in this portion of the statement appears to be referring to Victim as the person shooting at that point, as Brockington refers to Victim throughout her statement as "the guy who got shot."

came from the alleyway because I was sitting at the window all day." Once Victim was hit, Nelson went to see if he was okay. Brockington stated that when the girlfriend was yelling "there you go babe," she was tracking Nelson on the outside of the building, telling Victim where Nelson was located. Brockington saw that Victim was hit in the neck, and that's when she saw Nelson over Victim "saying 'come on, come on, man' like he was trying to help him up." Brockington stated Nelson "really didn't want to shoot at him or whatever," and that "[h]e was trying to get in his car to leave."

## V. The Jury Charge, the Verdict, and Sentencing

The trial court charged the jury on murder, voluntary manslaughter, self-defense, mutual combat, possession of a weapon during the commission of a violent crime, and possession with intent to distribute cocaine base. The jury found Nelson not guilty of murder and possession with intent to distribute cocaine base, but found him guilty of voluntary manslaughter and possession of a weapon during the commission of a violent crime. The trial court sentenced Nelson to twenty-five years' imprisonment on the voluntary manslaughter charge and gave him a consecutive five-year sentence for the weapon possession charge. This appeal follows.

## ISSUE

In this self-defense case, whether the trial court erred in refusing to grant a continuance or declare a mistrial when the defense's key witness, who would have testified that the decedent came to her apartment looking for the defendant with a shotgun and shot first at defendant, was in the hospital.

## STANDARD OF REVIEW

In criminal cases, this court sits to review errors of law only and is bound by the trial court's factual findings unless those findings are clearly erroneous. *State v. Wilson*, 345 S.C. 1, 5-6, 545 S.E.2d 827, 829 (2001). "The granting or denial of a motion for a continuance is within the sound discretion of the trial [court]." *State v. Babb*, 299 S.C. 451, 454, 385 S.E.2d 827, 829 (1989). "The trial court's refusal of a motion for continuance in a criminal case will not be disturbed absent a clear abuse of discretion resulting in prejudice to the appellant." *Morris v. State*, 371 S.C. 278, 283, 639 S.E.2d 53, 56 (2006). Likewise, "[t]he granting or refusing of a motion for a mistrial lies within the sound discretion of the trial court and its ruling

will not be disturbed on appeal unless an abuse of discretion amounting to an error of law occurs." *State v. Cooper*, 334 S.C. 540, 551, 514 S.E.2d 584, 590 (1999).

## LAW/ANALYSIS

Nelson argues the trial court erred in refusing to continue his case or declare a mistrial. He contends Brockington's testimony was essential for the jury's consideration of whether he acted in self-defense, and the trial court should have delayed the trial so she could testify. As to the trial court's criticism of his failure to subpoena Brockington until after the trial began, Nelson asserts he made the proper showing under Rule 7(b), SCRCrimP, for a continuance. Further, even if he had subpoenaed Brockington before trial, it would have made no difference because she was hospitalized. Nelson insists the trial court's refusal to continue the case or, in the alternative, grant a mistrial was error and it prevented him from having his case fairly heard by a jury. We agree.

"The granting or denial of a motion for a continuance is within the sound discretion of the trial judge whose ruling will not be disturbed on appeal absent an abuse of discretion resulting in prejudice to the appellant." *Babb*, 299 S.C. at 454, 385 S.E.2d at 829. "An abuse of discretion arises from an error of law or a factual conclusion that is without evidentiary support." *State v. Geer*, 391 S.C. 179, 189, 705 S.E.2d 441, 447 (Ct. App. 2010) (quoting *State v. Irick*, 344 S.C. 460, 464, 545 S.E.2d 282, 284 (2001)). "Reversals of refusal of a continuance are about as rare as the proverbial hens' teeth." *State v. McMillian*, 349 S.C. 17, 21, 561 S.E.2d 602, 604 (2002). "The party asking for [a] continuance [based upon an absent witness] must show due diligence was used in trying to procure the testimony of [the] absent witness as well as set forth what the party believes the absent witness will testify to and the grounds for that belief." *State v. Yarborough*, 363 S.C. 260, 266, 609 S.E.2d 592, 595 (Ct. App. 2005). Our courts have "repeatedly upheld denials of motions for continuances where there is no showing that any other evidence on behalf of the defendant could have been introduced, or that any other points could have been raised, if more time had been granted to prepare for trial." *State v. McKennedy*, 348 S.C. 270, 280, 559 S.E.2d 850, 855 (2002).

Generally, a motion for continuance should be made at the time the underlying reason for such becomes known. *See State v. Greuling*, 257 S.C. 515, 520, 186 S.E.2d 706, 708 (1972) (finding no merit to the argument the trial judge erred in refusing to entertain the motion for continuance when the motion was made after the trial had begun and upon grounds which existed prior to trial); *State v. Leonard*, 287 S.C. 462, 473, 339 S.E.2d 159, 165 (Ct. App. 1986), *rev'd on other*

*grounds*, 292 S.C. 133, 355 S.E.2d 270 (1987) ("[A] motion for continuance based on grounds which exist prior to trial ordinarily must be made before the jury is sworn.").

Rule 7(b) of our Rules of Criminal Procedure governs when a continuance may be granted based upon the absence of a witness and provides in pertinent part as follows:

> No motion for continuance of trial shall be granted on account of the absence of a witness without the oath of the party, his counsel, or agent to the following effect: the testimony of the witness is material to the support of the action or defense of the party moving; the motion is not intended for delay, but is made solely because he cannot go safely to trial without such testimony; and has made use of due diligence to procure the testimony of the witness or of such other circumstances as will satisfy the court that his motion is not intended for delay.

Rule 7(b), SCRCrimP. "All components of Rule 7(b), SCRCrimP, including that of the attestation under oath, are strictly required, and a party asking for a continuance must show due diligence in trying to procure the testimony of the witness, as well as what the party believes the absent witness would testify to and the basis for that belief." *State v. Colden*, 372 S.C. 428, 438, 641 S.E.2d 912, 918 (Ct. App. 2007). Testimony from an unavailable witness that is likely merely cumulative to other evidence introduced at trial does not supply a strong basis for a continuance pursuant to Rule 7(b), and there is no abuse of discretion in the trial court's denial of a continuance under such circumstances. *See State v. Morris*, 376 S.C. 189, 209, 656 S.E.2d 359, 370 (2008) ("[I]n light of the evidence introduced at trial, any testimony from unavailable witnesses or other unavailable evidence would likely have been cumulative. Accordingly, there is no indication that Appellant would have been able to make a successful argument for a continuance based upon Rule 7(b)."); *State v. Hawkins*, 310 S.C. 50, 54, 425 S.E.2d 50, 52 (Ct. App. 1992) (finding no abuse of discretion in the trial court's failure to grant a continuance on the ground of the absence of a material witness when a comparison of the affidavit with the testimony of other fact witnesses presented by the appellant indicated the testimony would have been cumulative).

A motion for mistrial is also in the discretion of the trial court.

> The grant or denial of a motion for mistrial lies within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion.  A mistrial should not be granted except in cases of manifest necessity and ought to be granted with the greatest caution for only very plain and obvious reasons.  The burden is on the movant to demonstrate error and resulting prejudice in order to justify a mistrial.

*City of Columbia v. Wilson*, 324 S.C. 459, 464, 478 S.E.2d 88, 90 (Ct. App. 1996).

The denial of an opportunity for an accused to present a material witness on his behalf raises serious constitutional concerns.  Our State Constitution provides as follows:

> The right of trial by jury shall be preserved inviolate. *Any person charged with an offense shall enjoy the right* to a speedy and public trial by an impartial jury; to be fully informed of the nature and cause of the accusation; to be confronted with the witnesses against him; *to have compulsory process for obtaining witnesses in his favor*, and to be fully heard in his defense by himself or by his counsel or by both.

S.C. Const. art. I, § 14 (emphases added).

Additionally, the Sixth Amendment of the United States Constitution states:

> *In all criminal prosecutions, the accused shall enjoy the right* to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; *to have compulsory process for obtaining witnesses in his favor*, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI (emphases added).

"The Sixth Amendment rights to notice, confrontation, and compulsory process guarantee that a criminal charge may be answered through *the calling* and interrogation *of favorable witnesses*, the cross-examination of adverse witnesses, and the orderly introduction of evidence." *State v. Mizzell*, 349 S.C. 326, 330, 563 S.E.2d 315, 317 (2002) (emphases added) (quoting *State v. Graham*, 314 S.C. 383, 385, 444 S.E.2d 525, 527 (1994)). "The Sixth Amendment is applicable to the states through the Fourteenth Amendment." *Id.*

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. 14, 19 (1967).

Our courts have long recognized a defendant's constitutional right to compulsory process may be violated if the defendant is forced to go forward in a trial without the presence of a material witness. In *State v. Dodgens*, 120 S.C. 239, 241, 113 S.E. 77, 77-78 (1922), our supreme court found the trial court's refusal to postpone a trial in order to obtain the presence of a material witness was a denial of the defendants' constitutional right to have compulsory process for obtaining witnesses in their behalf. In *State v. Williamson*, 115 S.C. 315, 317, 105 S.E. 697, 697 (1921), the appellant argued that the trial court erred in forcing him to trial in the absence of his wife, who was a material witness. His wife was far advanced in pregnancy at the time, and the affidavit of her family physician provided that it would be dangerous for her to attend the trial and testify in her condition. *Id.* The court noted the wife could not be present by reason of physical incapacity; she was the most material witness her husband had, having been the prime cause that led up to the difficulty that ended in the killing; she was present and witnessed the killing; and she had no opportunity to refute testimony from another witness concerning what she allegedly said at the time of the incident. Thus, it held the trial court "was

manifestly in error in not continuing the case, on showing made and under all of the facts and circumstances of the case." *Id.* at 318, 105 S.E. at 697-98.

In the more recent case of *McMillian*, McMillian's first trial resulted in a mistrial when the jury was unable to reach a verdict after re-hearing the testimony of the State's only neutral witness, Dorothy Rumph. 349 S.C. at 19, 561 S.E.2d at 603. A week later, McMillian's defense counsel requested portions of the first trial transcript, including Rumph's testimony. *Id.* However, the case was called to trial two days later (nine days after the mistrial), prior to receipt of the transcript. *Id.* McMillian moved for a continuance at the outset of the second trial in order to obtain portions of the transcript from the first trial, which was denied. *Id.* at 19, 21, 561 S.E.2d at 603, 604. After noting a discrepancy between Rumph's testimony in the first and second trial—which was relevant to her overall credibility—and the lack of credibility of the other witnesses presented by the State, our supreme court reversed and remanded for a new trial, finding the verdict hinged on Rumph's credibility and McMillian was hindered in his ability to impeach her. *Id.* at 22-23, 561 S.E.2d at 604-05. The court held as follows:

> Under the limited circumstances of this case, we find the trial court abused its discretion in denying McMillian's motion for a continuance. Given the limited amount of time between the first and second trial, the critical nature of Rumph's testimony, and the fact that no tapes or transcripts were available at the time of the second trial, we find that McMillian should have been granted a continuance in order to obtain portions of the transcript, and the lack of such a transcript prejudiced his ability to effectively cross-examine the witnesses against him.

*Id.* at 24, 561 S.E.2d at 605-06.

We hold the trial court abused its discretion in failing to grant a continuance or mistrial, resulting in prejudice to Nelson under the facts of this case.[5] *See Babb*,

---

[5] As a preliminary matter, the State does not argue, nor do we find, any error preservation problem with Nelson's assertion that the trial court erred in failing to grant him a continuance. Although defense counsel initially made a motion for a mistrial, it became clear that as the arguments before the court proceeded, the court

299 S.C. at 454, 385 S.E.2d at 829 ("The granting or denial of a motion for a continuance is within the sound discretion of the trial judge whose ruling will not be disturbed on appeal absent an abuse of discretion resulting in prejudice to the appellant."); *Wilson*, 324 S.C. at 464, 478 S.E.2d at 90 ("The grant or denial of a motion for mistrial lies within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion."); *id.* ("The burden is on the movant to demonstrate error and resulting prejudice in order to justify a mistrial."). The trial court appears to have denied the motion on two bases: (1) Nelson failed to exercise due diligence in procuring Brockington's testimony for trial and (2) Brockington's statement did not include anything on which the defense was not able to present evidence.

First, we agree with Nelson that he complied with Rule 7(b), SCRCrimP, and this includes the requirement that he act with due diligence in attempting to procure the testimony of Brockington. *See* Rule 7(b), SCRCrimP (requiring an oath that the party seeking a continuance based upon the absence of a witness "has made use of due diligence to procure the testimony of the witness or of such other circumstances as will satisfy the court that his motion is not intended for delay"); *Yarborough*, 363 S.C. at 266, 609 S.E.2d at 595 ("The party asking for [a] continuance [based upon an absent witness] must show due diligence was used in trying to procure the testimony of [the] absent witness as well as set forth what the party believes the absent witness will testify to and the grounds for that belief."); *Colden*, 372 S.C. at 438, 641 S.E.2d at 918 ("All components of Rule 7(b), SCRCrimP, including that of the attestation under oath, are strictly required, and a party asking for a continuance must show due diligence in trying to procure the testimony of the witness, as well as what the party believes the absent witness would testify to and the basis for that belief.").

The trial of this case started on Monday, June 12, 2017. The record reflects that defense counsel approached the trial court "the first day when [he] found out that [Brockington] wasn't here," but he was unaware she was going to the hospital at that time. Defense counsel explained that Brockington was going to appear voluntarily, he did not know Brockington was going into the hospital, and he approached the court when he first learned she was not there on the first day of trial, but he did not think at that time she had been taken to the hospital. Once counsel realized Brockington had been hospitalized, he had her subpoenaed at the hospital that Tuesday, June 13, 2017. When the State rested on Wednesday, June

---

understood that the motion was one to either continue the case or grant a mistrial, and the trial court ruled on the same.

14, 2017, defense counsel noted to the trial court that Brockington was presently hospitalized. On the morning of Thursday, June 15, 2017, defense counsel presented his Rule 7(b) affidavit, in which defense counsel attested that Brockington was a material and indispensable witness but that her testimony could not be attained; explained Brockington had been subpoenaed for the court proceeding but she was suffering from sickle cell anemia and awaiting a blood transfusion; averred his belief that if Brockington could attend the trial she would testify consistently with her pre-trial statement given to the Myrtle Beach Police Department; and stated he was not intentionally attempting to delay the proceedings, but he did not believe he could safely try the case without Brockington's testimony. Counsel also attached a copy of Brockington's police statement to the affidavit, as well as a hospital statement indicating Brockington was admitted to the hospital on June 13, 2017, and she would remain there until released by a doctor.

In ruling as it did, the trial court relied in part on the fact that Brockington was not actually subpoenaed until after the trial started, and the State maintains defense counsel failed to use due diligence in securing the witness because he did not seek a continuance prior to the commencement of trial. However, it is clear that defense counsel did not see the need to subpoena Brockington prior to trial because she was going to appear voluntarily, and he subpoenaed her on the second day of trial once Brockington failed to appear and he realized she was hospitalized. Further, even if defense counsel had subpoenaed Brockington prior to the commencement of trial, she would have been unavailable due to her hospitalization. Additionally, defense counsel could not have sought a continuance prior to the commencement of trial because no grounds existed for such at that time. *See Greuling*, 257 S.C. at 520, 186 S.E.2d at 708 (finding no merit to the argument the trial judge erred in refusing to entertain the motion for continuance when the motion was made after the trial had begun and upon *grounds which existed prior to trial*); *Leonard*, 287 S.C. at 473, 339 S.E.2d at 165, *rev'd on other grounds*, 292 S.C. 133, 355 S.E.2d 270 ("[A] motion for continuance based on *grounds which exist prior to trial* ordinarily must be made before the jury is sworn."(emphasis added)). In short, it was not the failure of the defense to subpoena the witness prior to the commencement of trial that caused her absence; rather, it was the witness' unexpected hospitalization after the commencement of the trial that caused her to be unavailable to testify. Once defense counsel became aware that Brockington was not going to be available to testify at the appropriate time, he made the proper motion and complied with Rule 7(b). Accordingly, Nelson acted with due diligence in attempting to procure the testimony of Brockington.

We next turn to the question of whether the likely testimony of Brockington would have been merely cumulative to other testimony that was already in the record or to testimony which Nelson could introduce through other witnesses, such that the denial of the motion for continuance or mistrial would have been proper on that basis.

The State presented evidence that after engaging in a physical altercation over a drug deal with Victim, Nelson left Victim's apartment but stayed in the apartment complex for an additional thirty to forty-five minutes; when Victim was outside waiting and yelling up to Nelson, he was wanting to engage only in a fist fight with Nelson and did not have a weapon in his hands; Nelson removed a rifle from the trunk of his car and approached Bloomer with the rifle in hand, demanding that she call Victim and instruct him to bring Nelson his "stuff"—ostensibly drugs Nelson left in the apartment; and when Victim came outside, Nelson shot him. The State also presented evidence that Victim did not fire a weapon at Nelson. In particular, it presented evidence that, although a shotgun and unfired shotgun shells were found lying close to Victim, no spent shotgun shells were found in the area; police found a couple of places where a round from the AR-15 rifle could have struck in the area, but found no physical evidence of a strike from a shotgun shell nor fired shotgun shells or wadding from a fired shotgun shell and there was no evidence a shotgun had been fired; and there was gunshot residue on Nelson's hands, but not on Victim's. Although Bloomer acknowledged giving a statement to police after the incident wherein she indicated that Victim shot at Nelson with the shotgun, she backtracked from her statement, clarifying that she only presumed this because she saw Victim with the shotgun and heard gunshots and but could not say for sure that Victim shot at Nelson. Bloomer also testified that over the course of approximately forty-five minutes after the initial physical altercation, Nelson did not retreat or leave, and when Victim took the shotgun out of his truck as they headed back upstairs, Victim was retreating, leaving the situation and deescalating it.

Brockington's statement indicates she was a critical witness to Nelson's defense. Although the defense was able to present evidence that Bloomer told the police that Victim did shoot at Nelson—and even that Victim shot first—Bloomer backed away from this statement during the trial. Further, the State presented testimony that no evidence was found that the shotgun had been fired by Victim. While there was evidence submitted that a nearby apartment showed damage from birdshot after the incident, it is not clear exactly when the damage occurred, nor that Victim fired the shotgun that caused the damage. Brockington's statement suggests that she perceived a gunshot fired from the alley—where Victim was located—first,

and then observed Nelson duck, and Nelson did not have the rifle in his hand at that time. Rather, Nelson was at the trunk of his car getting his gun in order to shoot back at the time Victim shot at him. Further, Brockington's statement indicates that Victim came into her apartment with a shotgun looking for Nelson and when Nelson came outside, Bloomer yelled to Victim, "here you go babe, here you go babe." According to Brockington's statement, when Bloomer yelled this, she was tracking Nelson's location for Victim. Brockington indicated she was certain the first shot came from the alley. She also stated that once Victim was hit, she believed Nelson went to the alley to see if Victim was okay, and Nelson was standing over Victim as if he was trying to assist him to stand. She stated Nelson really did not want to shoot at Victim and Nelson "was trying to get in his car to leave." Contrary to the State's assertion, Brockington's statement, especially when considered in conjunction with testimony presented at trial, supports Nelson's claim of self-defense.[6]

Like the witness in *Williamson*, Brockington was unavailable for trial due to a medical condition; she was a—if not the most—material witness for Nelson, having been present and a witness to some of the critical events; and she was not available to refute some of the evidence which her statement indicates was contrary to that of Bloomer's and that was pertinent to Nelson's claim of self-defense. Additionally, as in *McMillian*, Nelson was deprived of the opportunity to present evidence that reflected on the credibility of one of the State's prime witnesses, Bloomer. Finally, we disagree with the State's assertion that the case at hand is distinguishable from *Williamson* and *McMillian* because counsel in those cases used due diligence and Nelson did not. As previously noted, there was no basis for seeking a continuance before or at the start of the trial, as Brockington was not hospitalized until the second day of trial. As in *Dodgens*, the trial court's refusal to postpone the trial in order to obtain the presence of the material witness

---

[6] Assuming Brockington were to testify at trial consistent with her statement, there would be evidence before the jury that: Nelson retreated from Victim's apartment after Victim instructed Bloomer to get his gun during their initial physical altercation; within two and a half minutes of the altercation, Victim went down to the front of the building and, for several minutes, yelled up to the apartment building for Nelson to come down there and fight; Victim had a shotgun while he was down there; Victim went into the apartment of Nelson's cousin with his shotgun looking for Nelson; Bloomer was tracking Nelson to let Victim know of Nelson's whereabouts; and when Nelson did leave the apartment building and head toward his car, he did not have possession of his rifle and only after Victim began firing at Nelson did he retrieve his rifle.

was a denial of Nelson's constitutional right to have compulsory process for obtaining witnesses in his behalf. *See* S.C. Const. art. I, § 14 ("The right of trial by jury shall be preserved inviolate. Any person charged with an offense shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor."); U.S. Const. amend. VI. ("In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor."); *Mizzell*, 349 S.C. at 330, 563 S.E.2d at 317 ("The Sixth Amendment right[] to . . . compulsory process guarantee[s] that a criminal charge may be answered through the calling . . . of favorable witnesses." (quoting *Graham*, 314 S.C. at 385, 444 S.E.2d at 527)); *Washington*, 388 U.S. at 19 ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law."). Accordingly, we hold the trial court abused its discretion in failing to grant a continuance or mistrial, resulting in prejudice to Nelson.

For the foregoing reasons, we reverse Nelson's convictions and remand for a new trial.

**REVERSED AND REMANDED.**

**THOMAS, J., concurs. MCDONALD, J., concurs in result only.**